608

635 P.2d 1231

Margaret BUTLER, M. H. King Co., Earl J. Miller and John Yancey, Sun Valley Land Co., Mildred P. Hoggan, Earl J. Miller, Neola Cox Clark and Clarence Orson Cox, Agnes D. Cox, Elmer Taylor, Oliver Haroldson, Earl J. Miller and Frank Fullmer, and Estate of Douglas R. Parkinson, Deceased, Plaintiffs-Appellants,

v.

CITY OF BLACKFOOT, Idaho, Defendant-Respondent.

No. 13136.

Supreme Court of Idaho.

Aug. 5, 1981.

Rehearing Denied Nov. 23, 1981.

H. William Furchner, Furchner & Martsch, Blackfoot, for plaintiffs-appellants.

Jay H. Stout, Stout & Moss, Blackfoot, for defendant-respondent.

BISTLINE, Justice.

This case, which is before us for the second time, involves the validity of assessments for street improvement costs. In our first opinion, *Butler v. City of Blackfoot*, 98 Idaho 854, 574 P.2d 542 (1978) [*Butler I*], this Court held that the City of Blackfoot did not acquire statutory jurisdiction to assess appellant property-owners with the contested street improvement costs until May 9, 1974, the date on which the required hearing under I.C. § 50–1716[1] was held.

1. As noted in *Butler I*, 98 Idaho at 855 n.1, 574 P.2d at 543 n.1, the disposition of this case is controlled by the 1967 Local Improvement District Code.

The Court reversed the judgment of dismissal and remanded for further proceedings "to determine the exact amounts expended by the city on the proposed district prior to May 9, 1974 . . . ." *Id.* at 859, 574 P.2d at 547. Both parties at oral argument expressed regret at having to bring the case before the Court a second time, explaining that they do so only because of an inability to agree on the meaning of our first opinion. We acknowledge the existence of the problem.

The facts pertinent to this appeal are as follows. On July 16, 1973, the Blackfoot City Council entered into a cost-sharing contract with the state to reconstruct a seven-block portion of West Bridge Street in Blackfoot. On the same day, the city council contracted with Goodwin Construction Company to install a Bridge Street water line.

The city council subsequently decided to beautify the two-block portion of the street involved in this appeal. To that end, on April 3, 1974, the city issued written change orders in its contract with Goodwin Construction Company to provide for the installation of irrigation pipes and fixtures to water this area. This change order was signed by Goodwin Construction Company on April 3, 1974, and by the city project director on April 4, 1974. Actual materials and labor furnished up to May 9, 1974, totaled $2,953.57.

On April 19, 1974, the city council by resolution passed change orders authorizing the following expenditures: (1) $8,445.60 for exposed aggregate sections in the sidewalks; (2) $4,194.00 for a conduit, metering system and foundations for ornamental lights; and (3) $11,700.00 for tree grates, rings and guards. These written change orders were dated April 26, 1974, were signed by the Bannock Paving Company on May 16, 1974, by the Blackfoot City Mayor on June 24, 1974, and by the State Highway Construction Engineer on June 27, 1974. Engineering and construction fees totaling $2,707 were added to the cost of this work after May 9, 1974.

On remand, the trial court focused on the date on which the obligations were "in-curred" by the city. The court held that the expenses were not "incurred" until the mayor approved the change orders involved on June 24, 1974. The court concluded that of the above sums, only the $2,953.57 actually expended prior to May 9th was incurred by the city prior to May 9, 1974. The property owners appealed.

In *Butler I* the Court noted at the outset that "[s]tatutes authorizing local assessments must be strictly construed and complied with by municipalities exercising their statutory grants of power." 98 Idaho at 856, 574 P.2d at 544. The Court then held as follows:

"The process by which municipalities acquire statutory jurisdiction to order local improvements, the costs of which shall be assessed against benefited, abutting property owners, is described in I.C. § 50–1716. In order to acquire such jurisdiction, the municipality is required to conduct a hearing on the proposed district and after such hearing is required to ascertain whether the district was properly initiated, will be in the public's best interest, and will be able to pay its obligations as they mature. This language contemplates costs to be incurred in the future, after public protests have been voiced. . . . A municipality acquires no statutory jurisdiction to incur costs to be assessed against abutting property owners under the 1967 Local Improvement District Code until after it has complied with the provisions in I.C. § 50–1716. We therefore hold that the City of Blackfoot initially failed to acquire statutory jurisdiction to assess the appellants with those costs incurred prior to the May 9, 1974, hearing. These costs cannot be assessed against the appellants. Following the hearing, the city did acquire statutory authority to incur local improvement costs and those costs incurred after May 9, 1974, were properly assessed against appellants." *Id.* at 857, 574 P.2d at 545.

The Court further held that "[w]here a municipality originally lacks statutory jurisdiction to incur expenditures because it has not complied with the applicable statutory provisions, *it cannot later acquire jurisdic-*

*tion* to incur those costs by complying with the statutory procedures after the costs have been incurred." *Id.* at 858, 574 P.2d at 546 (emphasis added). In reversing, the Court remanded with directions "to determine the exact amounts expended by the city on the proposed district prior to May 9, 1974 . . . ." *Id.* at 859, 574 P.2d at 547.

There are three sums of money in contention here: (1) $24,339.60 for beautification of the sidewalk; (2) $2,707 for engineering and construction fees added to the above work after May 9, 1974; and (3) $7,316.41 for the installation of an irrigation system.[2]

We will address the last of these first. The written change orders for this work were signed and authorized for the City of Blackfoot by the project director on April 4 and 15, 1974. No contention is made that this did not constitute a binding contract, and we do not understand the trial court's failure to deal with these change orders separately from those signed by the mayor on June 24, 1974. The district court found that only the amount actually expended under this change order prior to May 9, 1974, was "incurred" by the city prior to May 9, 1974. By stating in *Butler I* that the costs had to have been incurred prior to May 9, 1974, we did not mean that the monies actually had to have been expended.[3] The change orders here were authorized by the city prior to May 9, 1974, and the city had therefore committed itself to the expenditure of these funds. Holding a hearing after binding itself to these change orders does not comport with the intent of I.C. § 50–1716 that costs not be incurred until after a hearing has been held at which it has been determined whether the district was properly initiated, will be in the public's best interest, and will be able to pay its obligations as they mature. The language above quoted from *Butler I*, 98 Idaho at 858, 574 P.2d at 546, and emphasized, was

the key for unlocking the intended holding of our opinion.

■ As stated by the court in *Murray v. City of LaGrande*, 76 Or. 598, 149 P. 1019, 1021 (1915), "[t]he contention of the defendants would make the acquisition of jurisdiction a condition subsequent. The plain logic of their position is that, notwithstanding the provisions of the charter, they may first decide and afterwards hear . . . . The situation is simply one where the water of jurisdiction has run past the mill of opportunity." The City of Blackfoot had obligated itself to these change orders prior to May 9, 1974, although the city was without jurisdiction to do so. Thus appellants cannot be assessed with these costs.

We will deal next with the change orders signed by the mayor on June 24, 1974. The city council authorized these orders by resolution passed April 19, 1974. The written change orders were dated April 26, 1974, but they were not signed by the Bannock Paving Co. until May 16, 1974, and by the mayor on June 24, 1974. The question then is whether these costs were "incurred," within the meaning of *Butler I*, prior to May 9, 1974.

I.C. § 50–1713 required a resolution of intention to create a local improvement district; such resolution shall state "the kind and character of the proposed improvement . . . and . . . the estimated total cost of the same . . . ." I.C. § 50–1714 provided for publication of notice of the resolution; such notice "shall describe the general character of the improvement or improvements proposed to be made and the estimated total cost thereof . . . ." I.C. § 50–1716 then provided that, after the hearing and required findings, the council "shall be deemed to have acquired jurisdiction to *order* the proposed improvements." (Emphasis added.) These provisions contemplate

---

**2.** The trial court's finding that an additional $7,070.21 in engineering fees was incurred prior to May 9 is not disputed. The City's share of the original state contract, $2,732.40, is included in the $24,339.60 figure for beautification. In view of our holding that the entire $24,339.60 was incurred prior to May 9, we need not consider this $2,732.40 separately.

**3.** Again our choice of language in remanding with directions to determine the amounts "expended" by the city prior to May 9 was unfortunate. We used the term synonymously with "ordered" and "incurred;" we did not mean that actual expenditures of funds was the determining criterion.

that the general nature of the proposed improvements and the estimated costs be known prior to creation of the local improvement district; they do not provide that the actual improvements and costs should already have been decided. Such a reading would negate the very purpose of these elaborate provisions for public input. If the city council could decide exactly what improvements it intended and submit a contract therefor to the contractor before public protests were heard, then the taking of public protests would become a mere formality with no actual impact on the planning process.

■ In *Butler I* the Court noted that the language of I.C. § 50–1716 "contemplates costs *to be incurred in the future, after public protests* have been voiced." 98 Idaho at 857, 574 P.2d at 545 (emphasis added). While our use of the word "incur" may have been unfortunate, we intended the word to be synonymous with the word "order" used in I.C. § 50–1716. The city here had already decided exactly what changes it wished to make in the contract when the public hearing was held, and the change orders had already been placed in the process which would lead to their being signed and approved by all the parties. Although the city did not yet have jurisdiction to order these improvements, it already had the contract drawn up to construct these improvements. We hold that under the language of I.C. § 50–1716 the city did not have jurisdiction to *order* these improvements prior to May 9; the mere fact that the orders were not signed until after May 9 does not validate them. A contrary holding would allow the city to have the contracts on the mayor's desk, waiting to be signed, when the public hearing is held. If the mayor signs them the next day, under the city's logic the property owners could be assessed with these costs. Such a reading destroys the purpose of I.C. § 50–1716 and our holding in *Butler I.*

■ Finally, we must decide whether the engineering and construction fees added to the above work after May 9 were "incurred" prior to May 9. These fees were incurred only because of the above work, yet the city was without jurisdiction to

order the above work. It would be improper to allow the city to assess appellants with additional costs which arose from work that the city did not have jurisdiction to order; since the city did not have jurisdiction to contract for the original work, appellants cannot be assessed with any fees arising from completion of that contract.

The judgment of the district court is reversed with directions to enter judgment in accordance with this opinion. Costs to appellants.

McFADDEN and SHEPARD, JJ., concur.

BAKES, Chief Justice, concurring in part and dissenting in part:

The majority opinion states, *ante* at 1234, "We hold that under the language of I.C. § 50–1716 the city did not have jurisdiction to *order* these improvements prior to May 9 . . . ." With that statement, I agree. However, the statement which immediately follows it ("the mere fact that the orders were not signed until after May 9 does not validate them") begs the real question: when does an order become an order? The majority assumes that the city can be held to have ordered these improvements before it ever signed the order form for them. The majority arrives at that conclusion, finding as a fact that "the change orders had already been placed in the process which would lead to their being signed and approved by all of the parties." *Ante* at 1234. The majority then finds that the city had ordered these improvements even though the orders had never been signed. The majority justifies this conclusion by stating that,

"A contrary holding would allow the city to have the contracts on the mayor's desk, waiting to be signed, when the public hearing is held. If the mayor signs them the next day, under the city's logic the property owners could be assessed with these costs." *Ante* at 1234.

It is interesting to note that the majority concludes, with regard to item No. 3, the $7,316.41 charge for installation of the irrigation system, that "[t]he City of Blackfoot *had obligated itself* to these change orders prior to May 9, 1974, . . . ." *Ante* at 1233

(emphasis added). As to Item No. 3, the majority concludes, and I concur, that those costs cannot be assessed against the appellants. But with regard to Item No. 1, the $24,339.60 for beautification of sidewalks, the order had not been signed, and therefore the city had not "obligated itself" as it had with regard to the charges for installation of the irrigation system. The majority assumes that because "the change orders had already been placed in the process which would lead to their being signed and approved by all the parties," *ante* at 1234, the city had irrevocably committed itself regardless of what evidence was presented at the hearings which were subsequently held. The trial court apparently didn't think so. It made no such finding of fact. It is hardly appropriate for this Court to make such a finding on appeal. The majority cannot point to any competent uncontroverted evidence in the record to support its assumption that the city intended to go ahead and sign the orders regardless of what evidence was presented at the hear-ings. Consequently, we must indulge in the well established legal presumption that the city officials would duly carry out their official responsibilities. *Roper v. Elkhorn at Sun Valley*, 100 Idaho 790, 605 P.2d 968 (1980); *Farm Bureau Finance Co., Inc. v. Carney*, 100 Idaho 745, 605 P.2d 509 (1980).

As of May 9, 1974, the city had not "obligated itself" by signing the orders, and therefore, in my view, the improvements had not been ordered within the meaning of I.C. § 50–1716. I would affirm the trial court, except as to the $7,316.41 for the installation of the irrigation system, which I agree the city had ordered, that is, "obligated itself" for, prior to the May 9 hearing date.

DONALDSON, J., concurs.