720 P.2d 197

Merl S. and Maxine E. SIMMONS, husband and wife; David L. Hood, guardian for the Estate of Marguerite C. Hood, State Tractor and Supply Co., Inc., an Idaho Corporation; Standard Lumber Company, an Idaho Corporation; Oscar E. and Alice E. Stube, husband and wife; Allen W. Johnston, a married man; Aldon M. Hoffman, a married man; Latah County Grain Growers, Inc., an Idaho Corporation; Nicholas J. and Carolyn C. Ogden, husband and wife; Frederic N. and Lynaire M.H. Banks, husband and wife; Mabel I. Walters, a single woman; Jay O. Mc Coy, a married man, and Oba A. Mc Coy, a married man, for themselves and on behalf of Mc Coy Plumbing, Heating and Bath Boutique, a partnership; Jack S. and Lanna L. Hammond, husband and wife; Cliff F. and Elsie Lathen, husband and wife; Harold J. and Helen G. Dahmen, husband and wife; Chi-Wu and Ya-Yen Wang, husband and wife; Moscow Grange No. 236; United Church of Moscow; Crites-Moscow Growers, Inc., an Idaho Corporation, Plaintiffs-Respondents-Cross Appellants,

v.

CITY OF MOSCOW, a Municipal Corporation of Idaho, Defendant-Appellant-Cross Respondent.

Roscoe L. WILLIAMS, Max E. Bingman, and Robert W. Peterson, Plaintiffs-Respondents,

v.

CITY OF MOSCOW, a municipal corporation of Idaho, Defendant-Appellant.

Milburn J. KENWORTHY and Bethine J. Kenworthy, husband and wife, and Milburn J. Kenworthy and Bethine J. Kenworthy, trustees for the Kenworthy Family Trust, Plaintiff-Respondents-Cross-Appellants,

v.

CITY OF MOSCOW, a municipal corporation of Idaho, Defendant-Appellant-Cross-Respondent.

Nos. 14958, 14991.

Supreme Court of Idaho.

May 29, 1986.

William L. Herrington, Moscow, for defendant-appellant-cross respondent City of Moscow.

Allyn M. Dingel, Jr., Bobbi K. Dominick and Robert M. Tyler, Jr., Moscow, for amicus curiae First Interstate Bank.

Dean Wullenwaber, Moscow, for plaintiff-respondent-cross appellant Simmons et al.

Robert W. Peterson, Moscow, Stanton P. Rines, Boise, for plaintiff-respondent-cross appellant Kenworthy.

Andrew M. Schwam, Moscow, for plaintiff-respondent Williams et al.

Edwin L. Litteneker, Lewiston, for amicus city of Lewiston on rehearing an James C. Meservy, Jerome, for amicus County of Jerome on rehearing.

## ON REHEARING

HUNTLEY, Justice.

This case arises from challenges by property owners to assessments levied by the City of Moscow ("the City") pursuant to I.C. §§ 50–1701 through 50–1770. In June, 1980, the City formed Local Improvement District No. 94 to pay approximately one-half of the $1,600,000 cost of a downtown revitalization project, the other one-half being supplied by federal matching funds. The project consisted of construction of new downtown improvements, reconstruction of deteriorated facilities, and addition of other downtown amenities, such as land-

scaping, street furniture, signage, and lighting. The project also included increased parking and expansion of an area known as "Friendship Square" to facilitate downtown activities and draw customers to the area.

The project was a response by business owners and civic leaders to their perception that downtown Moscow was losing business to two retail shopping malls on the outskirts of town, with the result that the downtown area was deteriorating. The major goal of the project was to maintain the downtown business district as a significant retail shopping area by (1) encouraging pedestrian traffic in the area; (2) improving access to and parking in the downtown area; (3) preventing further relocation of existing downtown businesses to the retail malls; (4) preventing a slide in property and rental values and in fact facilitating the enhancement of property values; (5) increasing safety by replacing an inadequate lighting system; (6) creating a fundamental unity downtown by providing consistent landscaping, lighting and street furnishings; (7) providing a downtown focus with the Friendship Square area; and (8) encouraging preservation and restoration of downtown buildings.

In the late 1970's a number of workshops and studies focused on goals and strategies for downtown revitalization. In late 1979, an economic development study was completed by planning consultants, architects and landscapers. This study (the "EDA study") proposed intensive development of Moscow's main street and enunciated a rationale for proceeding with downtown revitalization. In 1980, a downtown steering committee, composed primarily of downtown business owners, was appointed by the mayor to oversee revitalization plans and to make recommendations to the city council. The steering committee reviewed all of the revitalization activities and proposals before they were submitted to the city council. The committee's meetings were open to the public, and generally were attended by the press, downtown business owners and the general public.

In March 1980, the City received a federal grant of $800,000 to finance part of the cost of the proposed downtown improvements. The federal grant was to be matched by local funds raised by the LID.

Following community meetings involving downtown business people, property owners and community leaders, and after review of proposals from a number of architectural firms, TSG Architects, Inc., of Spokane, Washington, was hired to prepare an additional revitalization study. This study differed from the earlier EDA study in that it proposed basic improvements spread over a larger area, rather than an intensive improvement plan concentrated on Main Street as had been suggested by the EDA study. The City contracted with TSG to plan, design and engineer the downtown improvements.

The city council passed a resolution of intention to create the Local Improvement District, pursuant to I.C. § 50–1707, on May 22, 1980. That resolution provided notice that property assessments would be made "in proportion to the benefits derived to such property by said improvements." After notice and hearing (the "formation hearing"), the LID was duly formed by ordinance on June 7, 1980.

The city council, with advice from the downtown steering committee, determined that benefits derived from the improvements were to be related to proximity to the central part of the district. The assessment plan consisted of three zones within the district: primary, secondary and tertiary. Within each zone, costs would be assessed based on square footage of each parcel of property. The primary zone, consisting of the "core" area of downtown, was assessed at 100 percent of the cost per square foot of the improvements. The secondary zone, the area surrounding the primary zone, was assessed at 40 percent of per square foot cost, and the tertiary zone was assessed at 20 percent of per square foot cost. As a result, a parcel of property in the primary zone would be assessed at five times the amount assessed to a similar parcel in the tertiary zone and two-and-one-

half times the amount assessed to a similar parcel in the secondary zone. No timely appeal was taken by any property owner from the city council's action in forming the LID.

Prior to the formation of the LID, the City incurred some costs for engineering and design work which were included in the assessment. Once the ordinance was adopted, the City financed construction of the project by issuance of interim warrants. Construction took place from early 1981 through November, 1981.

In March, 1982, an assessment hearing was held pursuant to I.C. §§ 50–1713 and 50–1714. The hearing was open to the public for comment. Property owners were thereafter assessed in amounts which were about ten percent higher than the estimated assessments discussed at the formation hearing in 1980.

Nineteen property owners and a tenant timely appealed the assessments to the district court, also filing motions for summary judgment charging city council members with conflicts of interest, and charging violation of due process rights by lack of notice of the type of assessment method used.

The district court filed findings of fact, conclusions of law and order on summary judgment in August, 1982, holding that the LID had been properly formed, that the city council's actions were not void or open to challenge because of alleged conflicts of interest, and that due process had not been violated in the notice procedure.

Hearings followed in October, 1982 and January, 1983. At the close of trial the court ruled that the assessments were, in fact, not in accordance with a "benefits derived" method of assessment. The court stated that under a "benefits derived" method, assessments must be defined and measured as "the increase in market value before and after improvements." The City, the trial court stated, had not shown such increase. The trial court also refused to remand to the City for reassessment, and instead reassessed the parcels in conflict itself, by either reducing or annulling the assessments which had been appealed.

The City of Moscow appeals to this Court, asserting the judgment of the trial court is erroneous as a matter of law by:

(1) Failing to apply the proper presumption of validity to the actions of the city council in forming the LID and in performing the assessment;

(2) Incorrectly defining "benefits" and further incorrectly concluding that the City's method of assessment was not a "benefits derived" method;

(3) Annulling or modifying the assessment itself rather than remanding for the city to make reassessments pursuant to I.C. § 50–1720;

(4) Ruling that engineering and design expenses incurred prior to the formation of the LID were wrongfully assessed against district property owners; and

(5) Failing to limit the scope of review of the city council's action.

The property owners contend on cross-appeal:

(1) The trial court erred in granting summary judgment in favor of the city on the issue of whether a financial conflict of interest on the part of the city council members renders the LID assessments void.

(2) The trial court erred in granting summary judgment in favor of the city on the issue of whether the LID is void on due process grounds for improper notice of the method of assessment used.

## I. THE ISSUES ON CROSS–APPEAL

We first consider the issues presented by the property owners on cross-appeal.

### A. *Conflict of Interest*

The property owners note that several members of the city council owned property in the downtown business district. They argue that these city council members therefore had a financial conflict of interest because their votes on how much to assess each parcel of property affected the financial burden on their own property. Specifically, the property owners charge that the

city council expanded the boundaries of the assessment district much further than was appropriate in order to reduce the assessments on property that each of them owned.

■ The overwhelming majority of courts which have considered this issue have held that the ownership of property in a local improvement district does *not* disqualify a council member from participating in proceedings to form a LID or assess property levies. *Hibben v. Smith*, 191 U.S. 310, 24 S.Ct. 88, 48 L.Ed 195 (1903); *City of Coral Gables v. Hayes*, 74 F.2d 989 (5th Cir.1935); *Schumacher v. City of Bozeman*, 174 Mont. 519, 571 P.2d 1135 (1977); Annot., 2 A.L.R. 1207 (1919); 4 McQuillin, *Municipal Corporations*, § 13.35a (3d Ed. 1971); 56 Am.Jur.2d *Municipal Corporations*, § 142 (1971). Three principal considerations support this general rule. First, to the extent any special benefit accrues to property within a LID, there is a special assessment imposed to pay the cost thereof. To the extent a council member who owns property in an improvement district receives any benefit as the result of his or her vote in favor thereof, he or she must pay for it once assessments are levied. Second, the council member is not the sole beneficiary of the improvements. Rather, special benefits accrue to each and every property owner in the district. Third, disqualification of public officials who own property in a proposed LID would often have the effect of prohibiting a governing body from performing its statutory functions because of the absence of a necessary

quorum or majority. The construction of beneficial and desirable or necessary public improvements would thereby be inhibited. The trial court was, therefore, correct in concluding that the interests of the officials here did not invalidate the creation ordinance.

### B. *Notice and Due Process as to Assessment Methodology*

■ The property owners allege that the city council failed to assess properties by the "benefits derived" method announced in the city's notice of intention to create the LID, thereby depriving them of their rights to notice and due process. The trial court correctly concluded that I.C. § 50–1727 [1] applied to prevent the property owners from contesting the validity, legality, and regularity of the creation ordinance. Failure to contest the ordinance within 30 days results in the waiver of the right to contest the sufficiency of the notice regarding assessment methodology provided by the ordinance. Furthermore, this issue and assignment of error by the property owners is made moot by our ruling on the proper definition of the "benefits derived" assessment methodology in Part II.B. below.

### II. THE ISSUES ON APPEAL BY THE CITY

#### A. *Presumption of Validity*

■ The city first contends that the trial court failed to apply the proper presumption of validity to the city council's actions. The general rule is:

1. **50–1727. Publication and conclusiveness of proceedings.**— The council may provide for the publication of any ordinance, resolution or other proceedings adopted by it pursuant to this code in the official newspaper of the municipality. For a period of thirty (30) days after such publication any person in interest shall have the right to contest the legality of such ordinance, resolution or proceeding or any bonds which may be authorized thereby. No contest or proceeding to question the validity or legality of any ordinance, resolution or proceeding, or any bonds which may be authorized thereby, passed or adopted under the provisions of this code shall be brought in any court by any person for any cause whatsoever, after the expiration of

thirty (30) days from the date when the ordinance, resolution or proceeding was published, and after such time the validity, legality and regularity of such ordinance, resolution or proceeding or any bonds authorized thereby shall be conclusively presumed. If the question of validity of any bonds issued pursuant to this code is not raised within thirty (30) days from the date of publication of the ordinance, resolution or proceeding issuing said bonds and fixing their terms, the authority to issue the bonds, the legality thereof and of the assessments necessary to pay the same shall be conclusively presumed and no court shall thereafter have authority to inquire into such matters.

A public improvement having been made, the question of determining the area benefited by such improvement is generally held to be a legislative function, and such legislative determination, unless palpably unjust, is usually conclusive and not subject to judicial interference unless arbitrariness, abuse or unreasonableness be shown. 14 McQuillin, *Municipal Corporations*, 3d Ed. (1970), § 38.02.

Only "clear proof" of great force will warrant a conclusion that an assessment is erroneous so as to overcome the presumption of validity. 14 McQuillin, *supra* at § 38.186.

This Court stated in *McGilvery v. City of Lewiston*, 13 Idaho 338, 90 P. 348 (1907) that a city council's determination of an assessment under sewer districting authority should not be overturned unless it is either "unjust or oppressive". *Id.* at 351, 353. In *Robert Noble Estate v. Boise City*, 19 F.2d 927 (D.Id.1927), the court had under consideration the presumption in favor of a city council's decision:

[T]he presumption is that the assessing body complied with the statute when determining whether the adjacent property would be benefited by reason of the improvement equal to the amount of the assessment, and the burden rests upon one who attacks the assessment to show that the council did not take into consideration the extent the property would be benefited. *Id.* at 933.

There is extensive authority from other jurisdictions to support the presumption as stated by McQuillin. *See e.g. Town of Peoria v. Hensley*, 26 Ariz.App. 30, 545 P.2d 992 (1976); *Wing v. City of Eugene*, 249 Or. 367, 437 P.2d 836 (1968); *Meyer v. City of Oakland Park*, 219 So.2d 417 (Fla.1969).

The property owners urge that the presumption of validity in favor of the city council was applied by the trial court, but was nevertheless overcome by evidence that the city improperly applied the "benefits derived" method of assessment, and that assessments were made in excess of benefits and without regard to benefits to individual properties. The trial court was therefore justified, they conclude, in ruling that the city had in fact applied a "square foot" method, and not the "benefits derived" method as called for in the resolution of May 22, 1980. In response, the city raises its second issue on appeal, that is, that the trial court's interpretation of "benefits" and the "benefits derived" method of assessment constitutes error.

The trial court found that the "benefits derived" method of assessment is a separate and particular method of assessment distinguishable from the three other methods (front foot, square foot and combination of front and square foot) contained in I.C. § 50–1707(c),[2] and that the city did not properly apply that method, but instead used a modified square foot method of assessment to allocate costs. The court concluded there was no distinction between the city's method of assessment and the square foot method of assessment, which is a separate method under Idaho statute. The court further found that the city presented no facts, studies or logical basis to use the 100–40–20 ratio which the city applied in assessing costs to each zone. Finally, the trial court ruled that when the "benefits derived" method of assessment is used pursuant to I.C. § 50–1707(c), "benefits" should be defined as the increase in market value of each particular parcel of

---

**2. I.C. § 50–1707. Resolution of intention to create district.—** Upon the filing of a petition or upon initiation of a district by council action, the council shall at a regular or special meeting adopt a resolution giving notice of its intention to create the district, to make the improvements and to levy assessments to pay all or a part thereof. The notice shall contain:

\* \* \* \* \* \*

(c) A statement that the costs and expenses of the improvements will be assessed against the abutting, adjoining and adjacent lots and lands along or upon which such improvements are to be made and upon lots and lands benefited by such improvements and included in the district to be created according to a front foot method, or a square foot method, or a combination thereof, *or in proportion to the benefits derived to* such property by said improvements, and the council shall state the method so determined in said notice. (Emphasis supplied).

property before and after improvements, considering the property's highest and best use. We discuss the latter issue first, that is, the proper definition of "benefits."

### B. *Definition of "Benefits"*

 It is fundamental to assessment law that in order to validly assess costs of an improvement to affected property, the property must receive a special benefit, one that is more intense than that received by the rest of the municipality. 14 McQuillin, *supra,* at §§ 38.31 and 38.32; 2 Antieau, *Municipal Corporation Law,* § 14.02. An assessment must be reasonably proportional to the special benefit derived, but the law does not require that an assessment correspond exactly to the benefits received. 14 McQuillin, *supra,* at § 38.05; Bitter v. City of Lincoln, 165 Neb. 201, 85 N.W.2d 302 (1957); *City of Raleigh v. Mercer,* 271 N.C. 114, 155 S.E.2d 551 (1967). "Benefits capable of easy demonstration and mathematical exactness are not necessary to support an assessment. The most any officer or tribunal can do in this regard is to estimate the benefits as to each tract of land upon as uniform a plan as may be in the light afforded by available information." *Bitter, supra,* at 308.

The term "benefit" is not defined by Idaho's local assessment statutes. While many other jurisdictions primarily measure special benefits by the difference between the fair market value of the property before and after assessment, "courts are increasingly acknowledging that the special benefit to property assessed if [sic] not to be measured solely by the changes in market value, if any, before and after the improvement." 2 Antieau, *supra,* at 14.34. It has been noted, too, that the broad question concerning an assessment is whether the general value of the property has been enhanced rather than whether the present owner receives advantage. *Appeal of Public Service Electric & Gas Co.,* 18 N.J.Super. 357, 87 A.2d 344, 347 (1952). The court in *Meyer, supra,* observed that "in determining probable benefits, the general enhancement in value of the locality as a whole in which the improvement is to be

made may be taken into consideration in making an apportionment of benefits to the individual properties situate therein." *Id.* at 419 (quoting from *Atlantic Coast Line R. Co. v. City of Winter Haven,* 112 Fla. 807, 151 So. 321, 323 (1933).

A "benefit" has been described as not meaning simply an advance or increase in market value, but embracing actual increase in money value and also potential or actual or added use and enjoyment of the property. *Meyer, supra,* at 420; *Limpert v. Day,* 7 Ohio Misc. 231, 218 N.E.2d 209 (1966); *aff'd Graham v. Day,* 12 Ohio App.2d 9, 230 N.E.2d 453 (1967); *Arvidson v. Board of County Commissioners,* 27 Ohio Misc. 93, 269 N.E.2d 432 (1971). To determine special benefits solely on the basis of the increase in current market value results in too inflexible a standard by which to judge the special benefits accruing to the affected property. *Hawley v. City of Hot Springs,* 276 N.W.2d 704, 706 (S.D.1979); *Goodell v. City of Clinton,* 193 N.W.2d 91, 95 (Iowa 1971).

In *Indiano v. City of Indianapolis,* 148 Ind.App. 637, 269 N.E.2d 552 (1971) the court noted:

> Benefits are special when they increase the value of the property, relieve it from a burden, or make it especially adapted to a purpose which enhances its value.... [I]t is not necessary that the benefits be direct and immediate to justify an assessment. Future possibilities, if any, as well as collateral or indirect benefits, may be considered. *Id.* at 555.

In *Meyer, supra,* 219 So.2d at 419, the court observed:

> Many elements enter into the question of determining and prorating benefits.... They are physical condition, nearness to or remoteness from residential and business districts, desirability for residential or commercial purposes and many other [sic] peculiar to the locality where the lands improved are located.

Another court has noted that increased accessibility for fire equipment, healthier environment by elimination of mosquito breeding grounds, and aesthetics are all

"benefits" which may be considered in levying assessments for a street improvement. *Butaud v. City of Lake Charles*, 338 So.2d 358 (La.App.1976).

The fact that benefits conferred on property might not immediately be reflected in increased market value does not overcome the presumption of benefit. *Philadelphia B & W.R.R. v. Hazen*, 116 F.2d 543, 549 (D.C.Cir.1940); *Soo Line RR Co. v. City of Wilton*, 172 N.W.2d 74, 83 (N.D.1969). In *Soo Line*, the railroad urged that because its property was devoted to the business of operating the railroad, it did not derive any benefits from paving and other improvements to the street parallel to its property. In response to this argument the court responded:

> It certainly does not mean that before such an assessment can be levied and enforced the city must be able to show that by reason of the paving the abutting property has been advanced in market value to the extent of the assessment, or point out in detail the specific way and manner in which the requisite benefits are to be realized in the future. Were such to be the rule, few, if any, schemes of local improvement at the expense of the property immediately affected could ever be accomplished. It is natural for the average property owner to resent the burden thus laid upon him, and he easily persuades himself that the thing for which he is asked to pay is a detriment, rather than a benefit, to his land, and ordinarily it is not difficult for him to find plenty of sympathizing neighbors who will unite in supporting his contention. Indeed, the benefits to be derived in such cases are ordinarily not instant upon the inception or completion of the improvement, but materialize with the developments of the future. They are none the less [sic] benefits because their full fruition is postponed, or because the present use to which the property is devoted is not of a character to be materially affected by the improvement. *Id.* at 83.

■ In the instant case, the city has recognized that the goal and benefit envisioned by the business community, the downtown steering committee and the Moscow City Council was not simply an immediate increase in property values. The city identified a number of special benefits to the assessed property, including stabilization of property values and rents; improved access to downtown businesses; enhanced ability to use the downtown area for public activities; increased safety for downtown pedestrians and business customers; improved appearance of the downtown area; and increased likelihood of preservation and restoration of historic downtown buildings. There is extensive testimony which indicates that the city council considered these benefits in determining the method of assessment and the apportionment of costs. The city did not appraise the affected property before and after the improvements. Given the intangible and long-term nature of most of the benefits the city projected, such action would have been a purposeless effort and a useless expenditure of resources. Appraisal immediately after these improvements were completed would not be expected to show an immediate increase in market value—it may be years before the revitalization effort will yield the particular benefit, only one of many, of increased property values. We hold that the trial court's requirement of a "before and after" appraisal as the measure of benefits derived does not comport with a *practical* operation of the LID statutory scheme when a city selects the benefits derived method of assessment.

### C. "Benefits Derived" Method of Assessment

■ I.C. § 50–1707(c) does not define any of the methods of assessment. The trial court determined that each of the four methods of assessment was separate and distinct, and assumed that the employment of a square foot basis within the three zones was antithetical to the "benefits derived" method. We disagree with the latter conclusion.

A basic qualification of an assessment method is that there must be a factual correlation between the result of an assessment formula and the actual benefit conferred. The mere fact that area or frontage has been considered will not invalidate an assessment if it has been guided by the principle of apportioning expenses according to benefits. *McNally v. Township of Teaneck*, 132 N.J.Super. 442, 334 A.2d 67 (1975); later app. *McNally v. Teaneck*, 75 N.J. 33, 379 A.2d 446 (1977). The "benefits derived" method of assessment provides a more flexible method of apportioning costs than the front or square footage methods. The front and square foot methods may be satisfactory where an improvement is limited in scope and of proportionally equal benefit to all affected properties. A sewer, a roadway or a water line are examples of such improvements. Where, as in the instant case, benefits are contemplated to be less immediate and measurable, a method of assessment based *solely* on front or square footage will be inadequate. Area (square footage) may, however, be considered as a factor in determining benefits. *In re: Special Assessment for Paving Improvement*, 15 Ill.App.3d 357, 304 N.E.2d 496 (1973); *In re: City of Bellingham*, 159 Wash. 32, 292 P. 113 (1930). As such, square footage is simply one of many factors—a tool which a municipality may use to reach an equitable distribution of costs in relation to benefits.

The use of zones based on proximity is also a common tool in assessing benefits of many types of improvements. The more distant a property is from major improvements, the less benefit that property realizes. This Court has approved the use of zones for the purpose of assessment in proportion to benefits. *McGilvery v. City of Lewiston, supra*. In *Wing v. City of Eugene*, the Eugene City Council established four zones based on proximity to a downtown parking garage, the closest property paying the largest assessment, the more distant properties paying lesser assessments. In confirming this method of assessment, the Oregon Supreme Court stated:

> Inevitably, some land uses will be more benefited than others, and some presently not at all. But if the city council's plan for assessing the cost reasonably takes into consideration these differences, a court will not strike it down because it is not exactly fitted to the prospective benefit of each. The special assessments are not bound by "a system of delusive exactness." ... It is not necessary to refine the concept of benefits so as to make it serve equally each of the lots in the area.... 437 P.2d at 841.

A number of cases also approve the use of square footage as a measure of benefits *within* zones. *See e.g. Spencer Shopping Center Inc. v. City of Spencer*, 200 N.W.2d 513 (Iowa 1972); *Adam Schumann Associates v. City of New York*, 40 F.2d 216 (2d.Cir.1930) cert. den. 282 U.S. 838, 515 S.Ct. 20, 75 L.Ed. 745; *In re: City of Bellingham, supra.*

We also disagree with the trial court's finding that the City was unable to supply any basis for applying the ratio of 100–40–20 to allocate improvement costs. Mr. Benson Neilson, an architect employed by TSG Architects, testified that the architectural firm had described to the steering committee and the city council a number of assessment methods, including use of a ratio. The city council deliberated over the methods available, considering a 100–50–25 ratio as well as the one ultimately selected. A ratio was chosen as a fair and equitable way to distribute improvement costs among the zones of proximity.

Mr. David Peterson, urban economist and planner for TSG also testified as to the City's deliberation over an assessment ratio.[3]

---

**3.** A. My firm through TSG made the recommendation to the steering committee, the method of assessing and of a ratio process for making those assessments as equitable as possible, and in that process following the other work we had done we looked at four methods of developing an assessment process. We looked at straight relationship between cost and the im-

The City's Exhibit H indicates the allocation of projected actual expenditures among the zones compared with a second level of expenditures allocated at the ratio of 100–40–20 and based on square foot assessments. The percentages of expenditures for each zone are very similar between the allocation by actual expenditure, and the allocation by application of the ratio. This comparison supports the City's conclusion that the 100–40–20 ratio as applied reasonably estimated benefits derived.

The city presented ample evidence that the city council, in good faith and with adequate information before it, considered and selected a reasonable method of assessment. The method of assessment was in fact a "benefits derived" method, and the assessments levied appear to be reasonable approximations of value of the benefits derived by each property owner.

The property owners have not shown that the city council action in apportioning costs was fraudulent, oppressive, arbitrary, unjust, unreasonable or an abuse of discre-tion. In the absence of such a showing, the council's determination of assessment methodology must be affirmed. The trial court's invalidation of the assessments is reversed.

### D. *Pre-formation Expenses*

■ We also reverse as to the trial court's ruling that engineering and design expenses incurred prior to the formation of LID # 94 were wrongly assessed against property owners. The Legislature has determined that engineering expenses, along with other designated pre-formation expenses, may be included in the costs and expenses of a LID. I.C. § 50–1702(h). I.C. § 50–1710 specifies that the council "shall appoint an engineer and shall have prepared the necessary plans and specifications for the construction work ordered" prior to creation of an improvement district.

The agreement for architectural services between the city and TSG was executed on April 21, 1980, shortly before creation of the district. The agreement provided for development of a design plan, recommenda-

provement for property. We looked at front footage. We looked at land value and we looked at square footage. And following a lengthy process with them, our recommendation and they concurred in it, was for a square footage process as one part of an equation to get to the benefits.

And the second part of the equation to get to the benefits dealt with what we felt was a fair ratio, and our recommendation at that time was 100 percent for what is known as the primary area, 50 percent for the secondary area and 25 percent for the tertiary area. That was based upon a number of things.

First of all, we looked at the level of improvements that were going to occur, and we had recommended that there needed to be a strong central core and a place of identity and so, based on that, we felt it was natural that Main, which was at this center, should be the 100 percent area.

Secondly, we looked at the level of business activity, the types of businesses, not only now but according to the adopted general comprehensive plan, what [sic] the planners in this community had adopted as a guideline, where they saw the growth going, trends that we saw occurring, pedestrian activity and the land uses. And, thirdly, even though we did not primarily rely on it, we looked also at values to the extent that we could get them in rents and determined that the secondary area had about half of the potential benefit from this that the primary area had and the tertiary area had half again of what the secondary area [did].

And, based on that, we made recommendations of 100, 50 and 25 percent.

After the fact, not before, but after the fact, to check our work, we looked back with the architects at the dollars that were being spent in each area, total in mass, to compare them with the costs, and found that even though that wasn't our primary method, just to check our work we found that they were within a few percentage points as if we had based it on what costs were being spent where against what costs would be assessed.

So we felt quite comfortable that that was a fair and equitable basis.

Upon lengthy discussions with the steering committee, they slightly altered that to the same zone concept, the same square footage concept, the same process, but 100, 40 and 20 percent.

Q Do you have knowledge that these percentages conformed fairly closely to the amounts which were actually spent in the areas?

A Yes. It's my understanding from material as late as the first of this month, that has been sent me, that I have seen, that they are within a few percentage points in terms of the cost.

tions concerning LID boundaries, preparation and cost estimates, and presentation of the proposed design plan to the community. This preliminary work was necessary before the local improvement district could be established. Indeed, the trial court found that this work was, in fact, necessary.

The property owners argue, and the trial court found, that two cases, *Butler v. City of Blackfoot*, 98 Idaho 854, 574 P.2d 542 (1978) (*"Butler I"*) and *Butler v. City of Blackfoot*, 102 Idaho 608, 635 P.2d 1231 (1981) ("Butler II"), required that any costs incurred prior to the formation of a LID cannot be assessed against that district. The *Butler* cases were decided under the 1967 local improvement district code, which prohibited a contract for construction of local improvements until a district had been duly formed. The instant case must be decided under the 1976 local improvement district code, which specifically provides that certain expenses be incurred prior to formation of an improvement district, and authorizes expenses to be included within an assessment even if incurred prior to formation.

Moreover, the *Butler* cases are distinguishable in that they dealt with costs of *actual construction* which were contracted for prior to formation of an improvement district. Here, no expenses were incurred for actual construction prior to formation of LID # 94. The expenses incurred included preliminary architectural and engineering fees for development of a general plan of improvement, costs for determination of the boundaries of the district, preparation of cost estimates, legal fees for assistance of bond counsel and preparing preliminary notices and documents, printing, mailing and publication, the cost of service of various notices, and miscellaneous city expenses. These prelim-

inary expenses are legitimate costs of a local improvement district and as such are properly assessable against property owners in the local improvement district. *See*, 14 McQuillin, *supra*, § 38.138; 70 Am. Jur.2d, *Special or Local Assessments*, § 77 (1973).

*McGilvery, supra*, also addressed this issue. Therein the court stated:

The fact that the contract for this service was made in advance of the creation of the district is not a valid objection to the charge. It was necessary to determine what lots and parcels of land should be properly included within the district and could be drained by a sewer system therein before the creation of the district. 13 Idaho at 357, 90 P. 348.

[10] Because we conclude that the trial court improperly voided the City's assessments, we need not decide whether the trial court should have remanded to the city council for reassessment.[4]

Affirmed as to issues on cross-appeal. Reversed as to issues on appeal and remanded for entry of judgment consistent herewith.

Costs to appellant. No attorney fees on appeal.

DONALDSON, C.J., and SHEPARD, J., concur.

BAKES, J., concurs in the result.

BISTLINE, J., concurs and dissents and files an opinion.

BISTLINE, Justice, dissenting.

My views as expressed in my July 16, 1985 opinion * remain unchanged, and what I wrote then equally fits the same shoe, albeit on a different foot(ing). According-

---

**4.** On rehearing we were advised by counsel of a request by bond attorneys that we clarify the proper procedure under I.C. § 50-1720 in those cases when a trial court properly decreases some, but not all, assessments. We read I.C. § 50-1720 to require the matter then be referred

back to the city council for reassessment of all benefited properties within the district so the deficiency can be made up.

* Ed. note: see opinion; *infra*.

ly, I do not withdraw that opinion, but stand on it, and in doing so believe that the views therein expressed have been fortified by the additional insight gained on the re-hearing—some of which is incorporated into the majority's new opinion which it substitutes for its July 1985 opinion.[1] For instance, the Court as a whole now recognizes that in circumstances such as those here present there are benefits which are general and there are benefits which are special. Part II.B. of the majority opinion. In mentioning the *Meyer* case, p. 203, the majority speaks of a general enhancement to the "locality." The "locality" here, in the majority view, is that encompassed by the three zones which have been assessed. I do not agree, but see instead that the entire environs encompassed in the Moscow city limits are the generally benefited "locality." Anyone living in Moscow can point with pride to a revamped downtown district. Special benefits undoubtedly do accrue to those properties which are within the spruced-up area, and those properties should be assessed for those special benefits—but only after all the property within the city has made a proper contribution for the general benefit. This philosophy of fairness is in line with the majority's preamble to Part II.B.: "It is fundamental to assessment law that in order to validly assess costs of improvement to affected property, the property must receive a special benefit, *one that is more intense than that received by the rest of the municipality.*"

BISTLINE, Justice, concurring and dissenting.**

I concur in Justice Huntley's opinion for the Court, except for that portion which supplants the district court's determination of the "benefit derived" issue.

Briefly I will point out our difference. A requirement of the L.I.D. code is that assessments must be against "property benefited by the making of the improvements." I.C. § 50–1703(b). Section 50–1707(c) provides (inferentially) that *benefits by improvements* will be according to:

(1) A front foot method

(2) A square foot method

(3) A combination of (1) and (2), or

(4) In proportion to benefits derived by improvements to the property.

We are all agreed that this is so. I agree with Justice Huntley that "benefits derived" is the more flexible method, and that front and square foot methods, or a combination of those two, are readily adaptable to sewers, roadways, sidewalks, and water lines.

What I do not understand is how the majority concludes that "The method of assessment was *in fact* a benefits derived method." (Emphasis added.) Nor do I understand the balance of that sentence which adds that "the assessments levied *appear* to be reasonable approximations of value of benefits derived by each property owner." (Emphasis added.) Each clause of that sentence is a separate appellate finding of fact. Each is contrary to the district court's determination of fact that the City made its assessment on a footage basis, as applied differently to the three zones.

The district court's view that "benefits derived" requires an appraisal reflecting market value increase is consistent with the only prior legislative concern with the language benefits to property which is to be found in the Idaho Code, I.C. § 7–711(3). That provision has been applied without question for the 104 years since first enacted. At the time L.I.D. code was first enacted the State of Idaho and lesser con-

---

1. The withdrawing of opinions, a practice or procedure comparatively new with this Court in the past fifteen to eighteen years, does not generally seem either economically or judicially sound. Those who years later turn to this Court's opinion for guidance and enlighten-

ment, as we ourselves now turn back, can obtain a better flavor of the Court's ultimate *ratio decidendi* by knowing the whole process of metamorphosis, or evolution, as the case may be.

** Ed. note: This opinion was filed July 16, 1985.

demning authorities had forever used appraisals to determine such benefits for almost 80 years. It is to be presumed that the legislature was well aware of the practice when it used language similar to § 7–711(3) in the L.I.D. code. Language in the case of *City of St. Louis Park v. Engell*, 238 Minn. 309, 168 N.W.2d 3 (1969) supports the view of the district court:

> It is made clear in our cases dealing with special benefits that the same measure is utilized in this state to determine the amount of special benefits in a condemnation proceeding or in a levy of a special assessment.

This court has held that in assessment procedures special benefits are determined by the amount of the increase in the market value of the property attributable to the improvement. See, *In re Improvement of Superior Street*, Duluth, 172 Minn. 554, 216 N.W. 318; Spencer, *The New Minnesota Improvement-Assessment Procedure (Chapter 398, Laws of 1953)*, 38 Minn.L.Rev. 582. The same measure is utilized in condemnation cases where special benefits are properly deducted from the damages awarded. State, by *Mondale, v. Mecklenburg*, [273 Minn. 135, 140 N.W.2d 310]; *State, by Lord, v. Hayden Miller Co.*, 263 Minn. 29, 116 N.W.2d 535.

> *It is clear from the foregoing authorities that in both eminent domain and assessment proceedings the value of special benefits is found by determining what increase, if any, there has been in the fair market value of the benefited land. St. Louis Park, supra,* 168 N.W.2d at 8 (emphasis added).

As I comprehend today's opinion for the Court, its thrust is that the district court did not err in applying the fourth method of "benefits derived," but that the district court did err in not realizing that the City's use of the footage method was simply a part of its "benefits derived" method—and was in fact superior in quality to utilizing appraisals to determine what value of bene-

fit, if any, has accrued to the property by virtue of the improvement. It seems inescapable, however, that § 50–1707(c) is worded in the disjunctive. Assessment of benefits to the property benefited by the improvements are to be determined

> according to a front foot method,
> **or**
> a square foot method,
> **or**
> a combination thereof,
> **or**
> in proportion to the benefits derived to such property by said improvements. (Emphasis added.)

While I do not mount any challenge to the system of assessing which is envisioned in the majority opinion, nonetheless the statute is being rewritten by the Court in order to uphold city taxation of some property owners who do not abut on the area actually improved, and on whose property not one single copper has been expended. Some may remember that it was in part such taxation as this which prompted the thirteen colonies to exit the kingdom of Great Britain.

It has been suggested that the use of appraisers in determining benefit derived would be cumbersome and expensive, and hence have a chilling effect on such projects. I am not persuaded by that undocumented concern, having had considerable experience with the use of contract appraisers in government condemnation proceedings. In the instant case, if this Court takes the statutory law as written— as did the district court—then the benefits derived method requires a determination that property assessed has been benefited by the L.I.D. improvements. The amount of the benefit requires opinion testimony. As stated by the Supreme Court of Minnesota in In re Superior Street in Duluth, 172 Minn. 554, 216 N.W. 318 (1927):

> The determination of whether or not a particular tract of land is or is not specially benefited by a local improvement is

essentially a question of fact. It is usually a matter of opinion, to be determined from the opinions given by witnesses having qualifications entitling them to give their opinions. It is a subject upon which men may honestly differ. *Id.* at 321.

As already indicated, our holdings are that in this state assessments for local improvements must be based on the special benefits received by such property and must not materially exceed such benefits; that, in determining such benefits, the market value of the property is to be considered, and that, while the present use of the property may be taken into consideration, it is not controlling, and the property may be assessed irrespective of its then particular use, on the same basis as other property in the locality; .... *Id.* at 323.

Any attorney of even limited experience well knows that opinion testimony often differs. The problem here is not with the differing, but with the fact that the City of Moscow did not obtain any testimony in that regard in making its determination. For that reason the district court held in particular instances that the City's procedure was invalid as to certain owners. It very well might be that the district court should have set aside the assessments and allowed the City to do the re-assessing. But with the disposition the majority makes today, the propriety of the district court's decision to reassess rather than remind need not be unilaterally addressed.