**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| SANDS BETHWORKS GAMING, LLC, | : | No. 216 MM 2017 |
| | : | |
| Petitioner | : | Appeal from the Petition in the Nature of |
| | : | a Complaint Seeking a Declaratory |
| | : | Judgment and Injunctive Relief |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| REVENUE; C. DANIEL HASSELL IN HIS | : | ARGUED: May 17, 2018 |
| OFFICIAL CAPACITY AS SECRETARY | : | |
| OF THE PENNSYLVANIA DEPARTMENT | : | |
| OF REVENUE; AND THE | : | |
| PENNSYLVANIA GAMING CONTROL | : | |
| BOARD, | : | |
| | : | |
| Respondents | : | |

**OPINION**

**CHIEF JUSTICE SAYLOR**                    **DECIDED: April 26, 2019**

This matter is brought in our original jurisdiction and involves a constitutional

challenge to a recent amendment to Pennsylvania's gaming law. Under the

amendment, casinos pay a supplemental assessment on slot-machine revenue, and the

funds are then distributed primarily to underperforming slot-machine facilities to be used

for marketing and capital development.

**I.**

Approximately fifteen years ago, the General Assembly substantially widened the

scope of legalized gambling in Pennsylvania by passing the Pennsylvania Race Horse

Development and Gaming Act (the "Gaming Act").[1]  *See generally Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383 (2005) (upholding most of the Gaming Act against a challenge to the process by which it was enacted).  The Gaming Act authorized slot-machine operations as a newly-created aspect of the gaming landscape, with licenses divided into three types:  a Category 1 license authorizes slot machines at an existing horse racetrack; a Category 2 license allows for slot machines in a non-racing facility in a city of the first or second class, or in a revenue- or tourism-enhanced location; and a Category 3 license authorizes slot machines in an established resort hotel with at least 275 guest rooms.  *See* 4 Pa.C.S. §§1301-1305; *Mount Airy #1, LLC v. Dep't of Revenue*, 638 Pa. 140, 157 n.7, 154 A.3d 268, 278 n.7 (2016).[2]

Persons holding one of these types of licenses pay a 34% tax on the gross terminal revenue ("GTR") generated by their slot machines, *see* 4 Pa.C.S. §1103 (defining gross terminal revenue as slot-machine money received minus various types of payouts such as cash paid to slot-machine players), which is then transferred into the State Gaming Fund.  *See* 4 Pa.C.S. §1403 (establishing the State Gaming Fund within the Pennsylvania treasury).  They also pay a daily assessment of 5.5% of GTR into the Pennsylvania Gaming Economic Development and Tourism Fund (the "Gaming Tourism Fund"), which is administered by the Department of Community and Economic Development (the "DCED").  *See* 4 Pa.C.S. §1407(a)-(c).

---

[1] Act of July 5, 2004, P.L. 572 (as amended 4 Pa.C.S. §§1101-1904).  The act is codified as Part II of Pennsylvania's Amusements Code.

[2] As of 2017, a fourth category of slot machine licenses allows for slot machines at ten additional locations in Pennsylvania.  *See* 4 Pa.C.S. §1305.1.  Category 4 facilities are not at issue in this case as they are not affected by the statutory provisions challenged here.

The Gaming Act has been revised on multiple occasions since 2004. Of relevance here is amending legislation passed in 2017, known as Act 42. *See* Act of Oct. 30, 2017, P.L. 419, No. 42. Act 42 contains many varied provisions. For present purposes, it establishes a restricted account called the Casino Marketing and Capital Development Account (the "CMDC Account") within the Gaming Tourism Fund, to be administered by the Gaming Control Board (the "Board"). *See* 4 Pa.C.S. §§1407.1(a), (b). Act 42 states that, beginning on January 1, 2018, each Category 1, Category 2, and Category 3 slot-machine facility is required to pay a supplemental daily assessment of 0.5% of its GTR into the CMDC Account. *See id.* §1407(c.1). Besides these monies, Act 42 also provides for ongoing transfers of $2 million annually from the State Gaming Fund into the CMDC Account. *See id.* §1408(c.1).[3]

In terms of how the CMDC Account monies are used, first, the Board is required to make certain statutory distributions from the account.[4] These include disbursements of $4 million to each Category 1 or 2 licensee with a GTR of $150 million or less for the prior fiscal year; $2.5 million to any such licensee with a GTR between $150 million and $200 million during the prior fiscal year; and $0.5 million to each Category 3 licensee with a GTR of less than $50 million in the prior fiscal year. *See* 4 Pa.C.S. §1407.1(e)(1)(i)-(iii). If the CMDC Account lacks sufficient funds, these distributions are prorated according to a statutory formula. *See id.* §1407.1(e)(1)(iv). Any money remaining in the CMDC Account after such distributions are made is to be disbursed by

---

[3] Act 42 also includes a one-time payment into the CMDC Account of funds which had been designated for local law-enforcement agencies but remained unused as of the effective date of the act. *See id.* This one-time transfer is not legally significant in relation to this dispute.

[4] To be precise, the DCED makes these distributions at the direction of the Board. *See See id.* §1407.1(b).

the Board on a discretionary basis to Category 1, 2, or 3 licensees that have applied for grants, *see id.* §1407.1(e)(2), with the proviso that no casino may receive more than $4 million from the account in a single year, and no casino may receive any funds from the account during the casino's first two years of licensure.  *See id.* §1407.1(e)(3).

Under Act 42, the Board is tasked with notifying the Legislative Reference Bureau, for publication in the Pennsylvania Bulletin, when the GTR of all Category 1 and 2 licensees exceeded $200 million during the previous fiscal year, and the GTR of all Category 3 licensees exceeded $50 million during the previous fiscal year.  See *id.* §§1407(c.1)(1), 1407.1(f)(1), 1408(c.1)(1).  The challenged provisions of Act 42 expire when such notice is published, or ten years after Act 42's effective date, whichever occurs first.  See *id.* §§1407(c.1)(2); 1407.1(f)(2); 1408(c.1)(2).

## II.

In December 2017, Sands Bethworks Gaming, LLC ("Sands") – which operates slot machines at a casino in Bethlehem under a Category 2 license – filed in this Court's original jurisdiction a petition in the nature of a complaint seeking declaratory and injunctive relief, naming as respondents the Department of Revenue, its Secretary in his official capacity, and the Board (collectively, the "Commonwealth").  Sands challenged the constitutionality, both facially and as applied, of Act 42's provisions relating to the CMDC Account.[5]  Sands alleged that those provisions violated the Pennsylvania Constitution's requirement of uniform taxation, its mandate that all enactments have a public purpose, and its rule against special legislation.  Sands also claimed the scheme

---

[5] This Court has exclusive original jurisdiction to hear any challenge to, or render a declaratory judgment concerning, the constitutionality of the Gaming Act.  It is authorized to take such action as it deems appropriate (while retaining jurisdiction) to find facts or expedite a final judgment in connection with a constitutional challenge or a request for declaratory relief.  *See* 4 Pa.C.S. §1904.

violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the federal Constitution. Thus, Sands asked this Court to declare Sections 1407(c.1), 1407.1, and 1408(c.1) unconstitutional, and to enjoin the state from collecting the tax assessed under those provisions. Thereafter, Greenwood Gaming and Entertainment, Inc. – which operates slot machines under a Category 1 license at Parx casino and racetrack in Bensalem – was permitted to intervene as an additional plaintiff. Greenwood forwarded claims and arguments similar to those of Sands.

After oral argument, Sands notified this Court it had received a letter from the Office of Attorney General, which represents the respondents in this matter, stating that the Board intended to begin distributing funds from the CMDC Account in September 2018. Accordingly, Sands requested that we preliminarily enjoin such distributions until a ruling on the constitutionality of the challenged provisions of Act 42 is issued. We granted that request, directing the Board to retain all funds deposited into the account during the 2017-18 fiscal year until further order of this Court. We additionally noted that in the interim all affected slot machine licensees were still required to pay the supplemental daily assessment. *See Sands Bethworks Gaming, LLC v. Dep't of Revenue*, No. 216 MM 2017, Order at 1-2 (Pa. Aug. 30, 2018).

**III.**

Arguing that the CMDC Account program violates the Fourteenth Amendment, Sands calls our attention to *Thomas v. Kansas City Southern Railway Co.*, 261 U.S. 481, 43 S. Ct. 440 (1923) and *Morton Salt Co. v. City of South Hutchinson*, 159 F.2d 897 (10th Cir. 1947). *See* Brief for Petitioner at 34-36. In *Thomas*, Arkansas passed legislation creating a drainage district. To pay for the improvements, the law imposed a flat six-percent tax on the assessed value of all real estate within the district. The plaintiff, which had a rail line running through the district, complained that the railroad

would pay a significant portion of the cost but would receive little benefit since its tracks were above flood level. The Supreme Court agreed: although the railroad might receive a speculative benefit in the form of increased future traffic, this was insufficient to justify imposing on the railroad liability for a significant portion of the project's cost. Deeming the tax "grossly discriminatory," the Court affirmed the order of the federal appellate court, which had held that the tax violated the Equal Protection Clause. *Thomas*, 261 U.S. at 485, 433 S. Ct. at 441.

*Morton Salt* involved analogous facts. In that matter, a city sought to issue bonds to build a waterworks system, with the bonds to be retired by a flat tax on properties in the city. Morton Salt alleged it would pay 46 percent of the cost, but would receive no benefit since the system would not supply water to its property. In ordering preliminary injunctive relief, the Tenth Circuit acknowledged that the Fourteenth Amendment does not require that tax statutes – particularly general ones supporting schools, roads, law eforcement, or the like – impose precisely equal hardships on taxpayers or benefit them identically. *See Morton Salt*, 159 F.2d at 900-01. It observed, however, that the Amendment does impose some restraints: the government must give something to taxpayers in return for the tax, and hence, a tax which results in a "palpable inequality between the burden imposed and the benefit received" will be voided. *Id.* at 901.[6]

---

[6] While *Thomas* has generally been understood as being decided on equal protection grounds, *see, e.g.*, *S.W. Prop. Trust, Inc. v. Dallas Cty. Flood Control Dist. No. 1*, 136 S.W.3d 1, 14 (Tex. Ct. App. 2001) (Supp. Op. on Mot. for Reh'g), *Morton Salt* referred to due process rather than equal protection, finding that the tax was an "arbitrary taking of property without compensation." *Morton Salt*, 159 F.2d at 901.

*Morton Salt*'s formulation in this regard presumably reflects a conclusion that a special assessment which is grossly disproportionate to the benefit received by the taxpayer amounts to a "taking" of property under the Fifth Amendment's Takings Clause as applied to states through the Due Process Clause of the Fourteenth Amendment. That concept has support in some early decisions, *see, e.g.*, *Dane v. Jackson*, 256 U.S. 589, (continued…)

For its part, Greenwood advances a similar contention, highlighting this Court's decision in *Allegheny County. v. Monzo*, 509 Pa. 26, 500 A.2d 1096 (1985). *See* Brief for Intervenor at 27-29. *Monzo* involved an ordinance imposing a one-percent tax on all hotel-room rental income in Allegheny County to fund the building of a convention center in Pittsburgh. The convention center would result in more business for hotels in Pittsburgh, but not for hotels in distant parts of the county. The operator of a hotel in Monroeville challenged the tax on that basis, claiming it violated the Fourteenth Amendment's due process and equal protection guarantees, as well as tax uniformity precepts under the state charter.

This Court indicated that the "simple but controlling question is whether the state has given *anything* for which it can ask return." *Monzo*, 509 Pa. at 38, 500 A.2d at 1102 (quoting *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444, 61 S. Ct. 246, 249 (1940))

---

(…continued)

599, 41 S. Ct. 566, 568 (1921), although more recent cases have been somewhat ambiguous as to which Fourteenth Amendment precept – due process or equal protection – was involved. *Compare, e.g.*, *Concerned Taxpayers Coal. of Scarborough v. Town of Scarborough*, 576 A.2d 1368, 1369 (Me. 1990) (reciting that the taxpayers raised an equal protection argument), *with id.* at 1370 (rejecting the argument on the basis that the taxpayers were not deprived of due process); *see also Allegheny County. v. Monzo*, 509 Pa. 26, 38, 500 A.2d 1096, 1102 (1985) (referring to the challenged assessment as a "taking without due process" as well as a "violation of equal protection and state uniformity standards," albeit without providing developed reasoning distinguishing these types of violations).

Perhaps because of this uncertainty, some courts have used a litmus based on the concept of arbitrariness without directly stating which aspect of the Fourteenth Amendment it is founded on. *See, e.g.*, *Bitter v. City of Lincoln*, 85 N.W.2d 302, 307 (Neb. 1957) (recognizing that, while special assessments need not correspond precisely to the benefits received, they may not be "arbitrary, capricious, or unreasonable"); *see also Simmons v. City of Moscow*, 720 P.2d 197, 206 (Idaho 1986) (rejecting a constitutional claim where the tax was not "fraudulent, oppressive, arbitrary, unjust, unreasonable or an abuse of discretion").

(emphasis added by *Monzo*). Citing *Thomas* and *Morton Salt*, the *Monzo* Court continued that, as a general matter,

> [w]here the benefit received and the burden imposed [are] palpably disproportionate, a tax is not only a taking without due process under the Fourteenth Amendment to the United States Constitution, but also an arbitrary form of classification in violation of equal protection and state uniformity standards.

*Id.* at 38, 500 A.2d at 1102; *see also id.* at 40, 500 A.2d at 1103 (observing that "money may not be expropriated constitutionally from one group to the benefit of another" (citing *United States v. Butler*, 297 U.S. 1, 56 S. Ct. 312 (1935))). Because the tax effectively aided Pittsburgh hotels at the expense of the other hotels in the county, this Court determined it violated due process and equal protection, as well as several aspects of the Pennsylvania Constitution. *See id.* at 46, 500 A.2d at 1106; *cf. Leventhal v. City of Phila.*, 518 Pa. 233, 542 A.2d 1328 (1988) (upholding a similar hotel tax where the record did not support facts similar to those in *Monzo*).

In response, the Commonwealth contends that where, as here, no fundamental rights are burdened, a statutory classification will survive a due process or equal protection challenge if it is rationally related to a legitimate state interest. In areas of social and economic policy, this occurs "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S. Ct. 2096, 2101 (1993), *quoted in* Brief for Respondents at 43. Further, the Commonwealth notes, the burden of proof and evidentiary production is on the challenger.

Insofar as revenue-based taxes are concerned, the Commonwealth points out that the Supreme Court has rejected an equal-protection challenge to a statute imposing unequal taxes on slot-machine earnings, where revenue from machines at racetracks was taxed at 36 percent but revenue from machines on riverboats was taxed

at 20 percent. *See Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 123 S. Ct. 2156 (2003). There, the Court applied rational-basis scrutiny to the classification, and theorized that Iowa might reasonably have decided to tax earnings from riverboats at a lower rate to help the economies of river communities or encourage riverboats to stay in-state. *See id.* at 109, 123 S. Ct. at 2160. Whereas in *Fitzgerald* there was a 16 percentage-point difference, the Commonwealth forwards that, here, the differential is far less, particularly as casinos exceeding the threshold for automatic distributions can still apply for a discretionary grant, and there is a cap on how much money any given casino can receive in a single year. *See* Brief for Respondents at 46-47. The Commonwealth also observes that graduated tax rates are permissible under federal equal protection principles.

Finally, the Commonwealth maintains that the provisions here "merely serve to spread the economic benefits of legalized gaming" – including job creation, economic development, and enhanced tourism – "throughout the various parts of the Commonwealth hosting Category 1, Category 2 and Category 3 casinos," and that Act 42 does not transgress any constitutional limitations recognized by the United States Supreme Court regarding the drawing of statutory classifications in the tax arena. *Id.* at 48-49. The Commonwealth adds that it is reasonable to assume that all Category 1-3 licensees will attempt to exceed the threshold for automatic distributions eventually, at which point the challenged provisions will expire under the sunset provisions. *See id.* at 35. It suggests that the CMDC Account's temporary nature in this respect demonstrates that the challenged provisions are only "designed to get the gaming industry up and running rather than to benefit some facilities over others." *Id.* at 36.

## IV.

All duly enacted legislation "enjoys a strong presumption of validity, and 'will only be declared void if it violates the Constitution clearly, palpably and plainly.'" *Commonwealth v. Bullock*, 590 Pa. 480, 487, 913 A.2d 207, 211 (2006) (quoting *City of Phila. v. Commonwealth*, 575 Pa. 542, 573, 838 A.2d 566, 585 (2003)). The party challenging a statute's validity carries a heavy burden to prove it is unconstitutional. *See id.* at 487, 913 A.2d at 212 (quoting *Payne v. Dep't of Corr.*, 582 Pa. 375, 383, 871 A.2d 795, 800 (2005)). In matters of taxation, the Legislature retains "wide discretion." *Devlin v. City of Phila.*, 580 Pa. 564, 588, 862 A.2d 1234, 1249 (2004).

With that said, and as clarified in cases such as those discussed above, certain constraints apply where, as here, taxes are levied, not for general use by the state, but for specific projects or programs. Most pertinent for this matter, courts have viewed with disfavor circumstances in which the government enacts a special assessment but, for some subset of taxpayers, the tax imposed substantially outweighs any benefit received. One federal court has articulated that, unlike with general taxes, where special assessments are concerned there must "be some reasonable relationship between the burden imposed on each assessed property and the benefit, whether direct or indirect, which will be received by that property." *N.C. Elec. Membership Corp. v. White*, 722 F. Supp. 1314, 1335 (D.S.C. 1989); *cf. Bennett v. Bd. of Equalization of City of Lincoln*, 515 N.W.2d 776, 779-81 (Neb. 1994) (striking a special assessment for street paving as arbitrary and capricious, where some of the properties assessed for the project would receive the same benefit as another group of properties which were not required to pay the assessment).

*Monzo* is illustrative of the principle. In that matter, there was no dispute that the construction of a convention center in downtown Pittsburgh would serve a valid public

purpose and help the city's economy. The difficulty arose because the government did not limit the scope of the hotel tax to the hotels that would derive a benefit from the convention center. Instead, it imposed the assessment countywide so that some of the burden fell on hotels in remote areas of the county which were unlikely to realize any increased business from the convention center. The fact that the tax was uniform in its levy – each taxpayer was required to pay one percent of the income received from room rentals – was insufficient to save the legislation.

The CMDC Account program presents even greater difficulties, since there are only a small number of taxpayers (twelve at present), and the subset of those which receive a tangible benefit obtain, not an indirect advantage, but actual funds drawn directly from the account into which the taxpayers pay the special assessment. Apart from the annual $2 million contribution from the State Gaming Fund, which is relatively minor in the present context, this scheme tends simply to recirculate and redistribute money among the taxpayers – albeit with the mandate that any casino receiving funds from the CMDC Account must use them for marketing or capital development. *See* 4 Pa.C.S. §1407.1(d).

In this latter regard, we recognize that the Gaming Act's legislative purposes can reasonably be seen to subsume the advancement of marketing and capital development among casinos. As stated by the General Assembly, the act's goals include such items as increasing Commonwealth revenue, supporting tax relief and reduction for all Pennsylvania citizens, creating development and employment opportunities, fostering tourism, and ensuring the sustainability and competitiveness of the commercial gaming industry in Pennsylvania. *See* 4 Pa.C.S. §1102(2.1), (3), (6), (12.2). The Legislature could rationally conclude that these goals are best served when

most or all slot-machine facilities engage in adequate promotional activities and have enough money for beneficial capital improvements.

By extension, the Generally Assembly could reasonably believe that, for a limited time at least, assisting underperforming casinos to expand by means of such items serves the public interest, and that the CMCD Account program is designed to achieve that end. Indeed, the program's statutory sunset provision reflects the Legislature's limited intent in this regard. *See id.* §1407.1(f) (specifying that the CMCD Account provision – that is, all of Section 1407.1 – expires ten years after its effective date or upon notice that all of the affected licensees have reached the qualifying GTR levels, whichever occurs first); *see also id.* §§1407(c.1)(2) (same), 1408(c.1)(2) (providing for similar expiration of other transfers to the CMCD Account). Thus, we may assume that Act 42's passage was motivated by rational social-policy goals.

However, this only serves to place the circumstances of the present matter on a similar footing to those involved in *Monzo* – where, as noted, there was also little doubt that the assessment was prompted by a public purpose that the General Assembly could validly seek to foster. *See Leventhal*, 518 Pa. at 245, 542 A.2d at 1334 (referring to the establishment of a convention center in a city as "a legitimate public goal"). As developed above, the constitutional defect in *Monzo* was that the objective in question was advanced through a special levy imposed upon a limited group of taxpayers, a subset of which would not benefit in any meaningful way by the program.

The special assessment in issue here has similar features. For example, according to the Board, the fiscal-year 2017-18 GTR of a Category 1 licensee known as "Mohegan Sun" was approximately $202.8 million, placing it above the threshold to receive a mandatory distribution (notwithstanding that it paid over $1 million into the

CMDC account).[7]  Likewise, Parx Casino, which is owned by Intervenor, had a GTR of over $400 million, and hence, paid over $2 million into the account, but it is not entitled to a mandatory distribution for the fiscal year.  By contrast, during the same period another Category 1 licensee, known as "Harrah's Philadelphia," had a GTR of $199.7 million, only slightly below that of Mohegan Sun, and just under the $200 million threshold, thereby entitling it to receive a $2.5 million mandatory distribution.

Overall, the financial data published by the Board demonstrate that seven of the twelve taxpayers are not due to receive *any* mandatory distribution based on fiscal-year 2017-18 data.  At the same time, two are entitled to a $4 million mandatory distribution, two more are slated to receive $2.5 million, and one is set to obtain $0.5 million.  Indeed, Act 42 establishes a system specifically designed so that the taxpayers who pay the least into the CMDC Account are the most likely to receive a mandatory distribution from that account (and the less they pay, the more they receive), and *vice versa*.[8]

---

[7] *See* https://gamingcontrolboard.pa.gov/files/revenue/Gaming_Revenue_Weekly_20180701.pdf ("Board Data 2017-18"), last viewed January 14, 2019.  We may take judicial notice of these statistics.  *See* Pa.R.E. 201.

[8] The Commonwealth argues that the state may make ability-to-pay distinctions when deciding how to allocate tax-funded benefits, such as in social-welfare benefits.  *See* Brief for Commonwealth at 25 (citing *Gean v. Hattaway*, 330 F.3d 758, 771-72 (6th Cir. 2003) (noting the government may base such decisions on a person's ability to provide for himself without state assistance)).

The present situation is distinguishable in that we are not evaluating a statute which, in the interest of public health, safety, and welfare, allocates benefits funded pursuant to general tax laws.  Rather, we are addressing a special assessment scheme in the commercial arena which is designed to, in effect, cause underperforming casinos' marketing and capital-improvement costs to be subsidized by their competitors.

Insofar as the discretionary grants are concerned, it is possible that some of the higher-earning casinos will be eligible to obtain a small amount of money. The funds remaining for discretionary grants when the mandatory distributions are made will be approximately $262,000. Even if that sum is distributed only to casinos that did not receive a mandatory distribution, such casinos would receive an average of just over $37,000 – a small fraction of the money they paid into the CMDC Account, and an even smaller fraction of the mandatory distributions granted to their competitors.

This Court recognizes that the Gaming Act is unusual in that it created an entirely new industry in this Commonwealth, and it "provides a limited number of licenses and guarantees geographic monopoly status to some licensees and near-monopoly status to others, thus alleviating the effects of free-market forces[.]" *Mount Airy #1, LLC v. Dep't of Revenue & Eileen McNulty*, 638 Pa. 140, 163, 154 A.3d 268, 282 (2016) (Saylor, C.J., concurring and dissenting) (citing 4 Pa.C.S. §§1304(b), 1307). We need not decide whether a program such as the one presently in issue would be valid if conceived from the outset of legalized slot-machine gambling. Here, however, Act 42 imposes on companies that are already part of Pennsylvania's gaming industry an assessment system in which "the benefit received and the burden imposed [are] palpably disproportionate" to one another, by design. *Monzo*, 509 Pa. at 38, 500 A.2d at 1102.

Nor are we persuaded by the Commonwealth's reliance on the Supreme Court's *Fitzgerald* opinion. That decision allows for different classes of slot machine facilities – those on land near racetracks, and those on riverboats – to be taxed at different rates. It does not involve a special assessment in which money is extracted from one subset of a defined class of casinos and redistributed for capital development and promotional

purposes to other members of that same class.  As such, it is inapposite to the present controversy.

Finally, any advantage that a high-earning casino which does not qualify for an automatic distribution might receive from the gaming industry being "up and running" throughout Pennsylvania is too speculative to be considered a benefit proportional to the amount of money it must pay into the CMDC Account.

Accordingly, we conclude that the challenged CMDC Account provisions cannot be sustained under the precedent set by *Monzo* and the federal cases it relied upon, as "the benefit received and the burden imposed [are] palpably disproportionate" insofar as casinos which do not obtain a mandatory distribution are concerned.  *Monzo*, 509 Pa. at 38, 500 A.2d at 1102.  The tax is thus inconsistent with the Fourteenth Amendment.[9]

---

[9] *See generally supra* note 6 (discussing various theories courts have used to find such invalid under the Fourteenth Amendment).  In light of our holding we need not reach Sands' other claims.

In reference to Justice Wecht's suggestion that the present Fourteenth Amendment issue is "ancillary" in nature, Concurring Opinion, *slip op.* at 2, 16, we observe that the claim is one of four separate causes of action set forth in the complaint – any one of which, if meritorious, requires a finding that the CMDC Account program is constitutionally infirm.

The concurrence, moreover, would rather this Court invalidate the legislation based on the Uniformity Clause, relying on the novel concept that a *restricted-use* distribution made in the post-collection timeframe effectively lowers the recipient's *initial* tax liability. *See id.* at 14.  Notably, the Uniformity Clause, by its terms, is focused on the levying and collection of taxes, *see* PA. CONST. art. VIII, §1 ("All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority *levying the tax*, and shall be *levied and collected* under general laws." (emphasis added)), and this Court has never interpreted it in the manner advocated by the concurrence.  Particularly as the federal and state precedent reviewed above make it clear that the challenged legislation works a constitutional violation independent of the Uniformity Clause, we see no present need to decide whether the clause's prohibitions should be extended to a new category of circumstances.

**V.**

We now address whether those provisions should be severed from the Gaming Act.  The provisions of all statutes are presumed to be severable.  *See* 1 Pa.C.S. §1925; *see also D.P. v. G.J.P.*, 636 Pa. 574, 595, 146 A.3d 204, 216 (2016) (reciting that, when faced with "a constitutional flaw in a statute, we try to limit the solution to the problem" (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328, 126 S. Ct. 961, 967 (2006))).  Further, the Gaming Act itself states that, with exceptions that are not presently relevant, all of its provisions are severable.  *See* 4 Pa.C.S. §1902.

The supplemental assessment and CMDC Account program comprise aspects of the Gaming Act which stand apart from, and independent of, the remainder of the act, which is fully capable of operation without those provisions.  *Accord* Brief for Petitioners at 37 (describing the program as "a self-contained scheme").  As such, and as the parties agree, *see id.* at 36-38; Brief for Intervenor at 31; Brief for Respondents at 49-51, the challenged provisions – namely, Sections 1407(c.1), 1407.1, and 1408(c.1) – may be (and now are) severed from the statute as a whole, which is not affected by the present ruling.

**VI.**

Ordinarily, a ruling invalidating a tax statute is not applied retroactively so as to require the government to refund all taxes paid under the statute, as doing so "subjects the taxing entities to the potentially devastating repercussion of having to refund taxes paid, budgeted *and spent*[.]"  *Oz Gas, Ltd. v. Warran Area Sch. Dist.*, 595 Pa. 128, 145-46, 938 A.2d 274, 285 (2007) (emphasis added); *see also Mount Airy #1*, 638 Pa. at 160 n.11, 154 A.3d at 280 n.11 (noting money damages are ordinarily unavailable as a remedy for a constitutional violation).  That concern does not apply here because the funds have not been spent, but have been held in abeyance in the CMDC Account

during the pendency of this matter. The sole purpose of those funds, as noted, is to implement the distribution scheme contemplated by the now-severed provisions.

That scheme cannot be implemented in light of our holding, and there is no remaining statutory directive regarding the disposition of the monies which the casinos have thus far paid into the CMDC Account. This suggests that the appropriate remedy is for the Commonwealth to refund such monies to those who paid them – and indeed, that is the remedy favored by all parties to this litigation. *See* Brief for Petitioner at 41-46 (arguing that such a refund is legally permissible and appropriate under the circumstances); Brief for Intervenor at 29-33 (same); Brief for Respondents at 21-22 (acknowledging that the Commonwealth has "agreed to facilitate a refund to Sands in the event that the challenged statutory provisions are invalidated . . ., thereby making it unnecessary for this Court to decide whether retroactive relief of that kind would otherwise be appropriate").

Accordingly, we direct that the supplementary daily assessment monies paid into the CMDC Account under 4 Pa.C.S. §1407(c.1) by Sands, Greenwood, and any other Category 1-3 casino, be refunded to them.

Jurisdiction is relinquished.


Justices Baer, Todd, Donohue and Dougherty join the opinion.

Justice Wecht files a concurring opinion in which Justice Mundy joins as to Parts I, III, IV, and V.