**[J-20-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| ALCATEL-LUCENT USA INC., | : | No. 8 MAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 803 FR |
| | : | 2017 dated December 28, 2022, |
| v. | : | sustaining the exceptions filed on |
| | : | October 13, 2021 to the September |
| | : | 13, 2021 Order, Reversing the |
| COMMONWEALTH OF PENNSYLVANIA, | : | decision of the PA Board of Finance |
| | : | and Revenue at No. 1628908 dated |
| Appellant | : | August 23, 2017 and remanding. |
| | : | |
| | : | ARGUED: March 6, 2024 |

**OPINION**

**JUSTICE WECHT**                                          **DECIDED: November 20, 2024**

In *Nextel Communications of Mid-Atlantic, Inc. v. Pennsylvania Department of Revenue*,[1] we held that the 2007 net-loss carryover deduction to Pennsylvania's corporate net income tax violated the Uniformity Clause of the Pennsylvania Constitution[2] because it favored one group of corporate taxpayers and disadvantaged another. Subsequently, in *General Motors Corp. v. Commonwealth*,[3] this Court concluded that our *Nextel* decision applies retroactively to taxes that were collected before that decision. We

---

[1]     171 A.3d 682 (Pa. 2017).

[2]     PA. CONST. art. VIII, § 1 ("All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax[.]").

[3]     265 A.3d 353 (Pa. 2021).

hold today that *General Motors* was erroneous, and that *Nextel* should apply only prospectively. Accordingly, we reverse the decision of the Commonwealth Court.

## I. *Nextel*

We begin by examining this Court's decision in *Nextel*, which involved a Uniformity Clause challenge to the net-loss carryover deduction to Pennsylvania's corporate net income ("CNI") tax. Corporations are subject to Pennsylvania's CNI tax if they do business, carry out activities, or own property within the Commonwealth.[4] For the tax years at issue in *Nextel*, the CNI tax was 9.99% of the corporation's federal taxable income, as defined by the IRS. Because the CNI tax is calculated based on the IRS' definition of taxable income, a corporation's losses necessarily are deducted from its income.

The net loss carryover ("NLC") deduction comes into play when a corporation has negative income, meaning that the corporation's calendar-year losses exceed its calendar-year income. When this happens, the corporation is said to have a "net operating loss." A corporation with a net operating loss can reduce its taxable income to zero and then carry over any remaining, un-deducted losses into a future tax year or years. But there is a statutory "cap" on these carryover deductions, which limits the amount of carried-over losses that can be deducted in any given calendar year.

Our decision in *Nextel* concerned the constitutionality of the 2007 cap on carried-over losses, which allowed corporations to deduct the greater of $3 million or 12.5% of the corporation's 2007 taxable income.[5] Nextel claimed that the cap violated the Uniformity Clause because it allowed taxpayers with incomes below $3 million to fully offset their CNI tax liability, while larger companies (with taxable income greater than $3

---

[4]    72 P.S. § 7402(a).

[5]    72 P.S. § 7401(3)4.(c)(1)(A)(II), *partially invalidated by Nextel*, 171 A.3d at 705.

million) could not do the same. In other words, Nextel argued that the 2007 cap created separate classes of taxpayers based solely upon income level—something that this Court has said the Uniformity Clause prohibits in other contexts.[6]

Before the case reached this Court, the Commonwealth Court had agreed with Nextel that the 2007 cap violated the Uniformity Clause. In fashioning a remedy for that constitutional violation, the intermediate court explained that:

> the unequal treatment suffered by Nextel must be remedied, and it can only be remedied in one of two ways—the favored taxpayers pay more or Nextel pays less. The latter is the only practical solution. Nextel seeks a refund of corporate net income tax paid in 2007. This is an appropriate remedy. Like similarly-situated taxpayers with $3 million or less taxable income in the 2007 Tax Year, Nextel should be permitted under the NLC deduction provision to reduce its taxable income to $0 by virtue of its positive net operating loss position that tax year.[7]

On appeal, this Court affirmed the Commonwealth Court's Uniformity Clause analysis but disagreed with the intermediate court's chosen remedy. We explained that there were three potential remedies available to cure the Uniformity Clause violation. We could either: "(1) sever the flat $3 million deduction from the remainder of the NLC; (2) sever both the $3 million and 12.5% deduction caps and allow corporations to claim an unlimited net loss—the remedy chosen by the Commonwealth Court majority; or (3) strike down the entire NLC and, thus, disallow any net loss carryover."[8] The question, therefore,

---

[6] *See In re Cope's Est.*, 43 A. 79, 82 (Pa. 1899) ("The money value of any given kind of property . . . can never be made a legal basis of subdivision or classification for the purpose of imposing unequal burdens on [similarly situated] classes.").

[7] *Nextel Commc'ns of Mid-Atlantic, Inc. v. Commonwealth*, 129 A.3d 1, 13 (Pa. Cmwlth. 2015).

[8] *Nextel*, 171 A.3d at 703.

became "which of these actions would be most consistent with the legislature's intent in enacting the NLC."[9]

Reviewing the history of the NLC deduction in Pennsylvania, we noted that the deduction was introduced for the first time in 1980 in order to "assist new 'high technology' businesses that were focused on the rapid development of new products, as well as to assist existing construction and farming enterprises which had been harmed by a recent recession."[10] The deduction, which was uncapped, remained in place for eleven years until it was completely eliminated in 1991 as part of a broader effort to raise revenue amid another recession. The legislature then reenacted the deduction three years later, in 1994, but the reinstated version was capped at $500,000 for all corporations. Since 1994, both the deduction and the cap have remained in place (with the cap steadily increasing over the years). We explained that the above history

> establishes that the General Assembly first granted the deduction without any cap at all, but abandoned this approach based on its determination that such an uncapped deduction had significant deleterious consequences for our Commonwealth's fiscal health. However, our legislature perceived that the deduction provided some public benefit by encouraging investment in the development of new technologies, as well as the acquisition of the physical infrastructure necessary to implement those technologies. Thus, the legislature reintroduced the deduction in 1994, but attempted to avert the excessive drain on the public fisc the prior unlimited deduction had caused by imposing a cap on the amount of this deduction which a corporation could take in a given tax year, and the legislature has steadfastly maintained this cap in various forms for the last 23 years. *See* Majority Caucus Brief at 2-4 (discussing evolving history of corporate net loss carryover deduction and highlighting that, since its reinstitution in 1994, it "has contained a dollar cap of some stripe"). Thus, the overall structure of the NLC reflects the legislature's intent to balance the twin policy objectives of encouraging investment (by allowing corporations to deduct some of the losses they sustain when making such investments against

---

[9]    *Id.*

[10]    *Id.* at 703-04.

their future revenues), and ensuring that the Commonwealth's financial health is maintained (through the capping of the amount of this deduction).[11]

Turning to the three severance options, we concluded that the legislature's joint policy objectives could best be effectuated by severing the $3 million flat deduction, thus limiting all corporations to a deduction of 12.5% of their taxable income for 2007. This, we explained, would allow every corporation "to avail itself of a net loss carryover deduction, as the legislature intended, but such deduction will be equally available to all corporations during that year, no matter what their taxable income."[12] By contrast, the Commonwealth Court's chosen remedy (striking the entire NLC cap) contravened the legislature's intent to limit the deduction. In this regard, we underscored that the legislature, since the reinstatement of the deduction in 1994, consistently imposed a cap to avoid a repeat of the budgetary damage caused by the unlimited deduction that was in place from 1980-1991. We therefore reasoned that "[t]o remove all caps and allow unlimited net loss deductions would be clearly contrary to the wishes of the General Assembly."[13]

## II. *General Motors*

Four years after *Nextel*, this Court decided *General Motors Corp. v. Commonwealth*,[14] which involved a Uniformity Clause challenge to the cap on NLC deductions for the 2001 tax year. The statute at issue in *General Motors* imposed a flat $2 million cap on carried-over losses for all corporations. In other words, the 2001 statute did not have the either/or structure (*i.e.*, "X dollars or Y percent of taxable income") that the 2007 cap we struck down in *Nextel* had. Under the 2001 statue, all companies—

---

[11]  *Id.* at 704.

[12]  *Id.*

[13]  *Id.* at 705.

[14]  265 A.3d 353 (Pa. 2021).

regardless of size or income—were limited to a maximum $2 million NLC deduction. The parties in *General Motors* agreed that this $2 million cap was unconstitutional for the same reason that the *Nextel* cap was unconstitutional. The only question for this Court was whether *Nextel*'s reasoning should apply retroactively to taxes that became due and were collected long before *Nextel* was decided.

"Whether a judicial decision should apply retroactively is a matter of judicial discretion to be decided on a case-by-case basis."[15] A majority of this Court in *General Motors* applied the three-factor *Chevron*[16] test to determine whether *Nextel*'s reasoning should be applied to taxes that were collected prior to our 2017 decision in *Nextel.* Under that test, courts must examine on a case-by-case basis: (1) whether the decision in question established a new principle of law; (2) whether retroactive application of the decision would advance or thwart operation of the underlying rule; and (3) whether the relevant equities dictate prospective application.[17]

The *General Motors* majority held that the "first [*Chevron*] factor controls because *Nextel* did not establish a new principle of law."[18] Rather, the majority said that *Nextel* "steadfastly adhered" to longstanding precedent "interpreting the Uniformity Clause to invalidate tax 'classifications based solely upon the quantity or value of the property being taxed.'"[19] Specifically, the *General Motors* Court cited *Cope's Estate*,[20] *Kelley v.*

---

[15]  *Passarello v. Grumbine*, 87 A.3d 285, 307 (Pa. 2014).

[16]  *See Chevron Oil Co. v. Huson*, 404 U.S. 97, 106 (1971).

[17]  *Oz Gas, Ltd. v. Warren Area Sch. Dist*., 938 A.2d 274, 282 (Pa. 2007).

[18]  *Gen. Motors*, 265 A.3d at 368.

[19]  *Id.* (quoting *Nextel*, 171 A.3d at 696).

[20]  *In re Cope's Est.*, 43 A. 79 (Pa. 1899).

*Kalodner*,[21] *Turco Paint & Varnish Co. v. Kalodner*,[22] *Commonwealth v. Warner Bros. Theatres, Inc.*,[23] *Saulsbury v. Bethlehem Steel Co.*,[24] *Amidon v. Kane*,[25] and *Mount Airy #1, LLC v. Pennsylvania Department of Revenue*.[26] As we explain in more detail below, however, each of these cases involved taxes that are distinguishable from the NLC deduction to the corporate net income tax. The *General Motors* majority nevertheless concluded that *Nextel* did not establish a new principle of law, on the theory that the decision merely "applied this Court's jurisprudence developed consistently in *Cope's Estate*, *Kelley*, *Saulsbury*, *Amidon*, and *Mount Airy* holding that the Uniformity Clause is violated where a difference in taxation is 'based solely on a difference in quantity of precisely the same kind of property.'"[27] Having determined that *Nextel* "merely applied [a] century of jurisprudence to the NLC deduction provision," the *General Motors* majority concluded that the decision "does not necessitate prospective application under the *Chevron* test."[28]

### III. The Present Dispute

This appeal involves a Uniformity Clause challenge to Pennsylvania's 2014 cap on net-loss carryover deductions. The statutory cap at issue allowed corporations in 2014 to carry forward net operating losses from prior years, but only up to the greater of

---

[21]    181 A. 598 (Pa. 1935).

[22]    184 A. 37 (Pa. 1936).

[23]    27 A.2d 62 (Pa. 1942).

[24]    196 A.2d 664 (Pa. 1964).

[25]    279 A.2d 53 (Pa. 1971).

[26]    154 A.3d 268 (Pa. 2016).

[27]    *Gen. Motors*, 265 A.3d at 373 (quoting *Nextel*, 171 A.3d at 699).

[28]    *Id.* (footnote omitted).

$4,000,000 or 25% of the company's 2014 net income.[29]  In 2014, Alcatel-Lucent USA Inc. ("Alcatel") had a Pennsylvania net income of $27,332,333, but the firm also had accumulated net operating losses from prior years which exceeded that amount. Because of the statutory cap, Alcatel was able to carry over only $6,833,083 of these accumulated losses to reduce its 2014 taxable income.  That left the company with a taxable net income of around $20,000,000, meaning that the firm owed the Department of Revenue roughly $2,000,000 in CNI tax for the year.  Alcatel paid that amount, and the Department of Revenue accepted Alcatel's tax report and did not issue any further assessments.

Alcatel subsequently filed a timely petition for a refund with the Department's Board of Appeals, arguing that the 2014 NLC cap violates the Uniformity Clause.  To remedy the Uniformity Clause violation, Alcatel argued that the deduction should be recalculated without any cap at all, thereby reducing Alcatel's 2014 taxable net income to zero.  The Board of Appeals denied Alcatel's request, pointing out that it lacks authority to decide constitutional challenges.  Alcatel then appealed to the Board of Finance and Revenue, which denied relief for the same reason.

Alcatel then filed a timely petition for review in the Commonwealth Court.  The parties agreed that the 2014 cap was unconstitutional and focused their advocacy on whether *Nextel* should apply retroactively to the 2014 tax year.  A three-judge panel of the Commonwealth Court initially affirmed the Board's order denying Alcatel a refund.[30] The panel applied the three-factor *Chevron* test and concluded that *Nextel* should not apply retroactively.  The panel opined that the first *Chevron* factor weighed in favor of

---

[29]     72 P.S. § 7401(3)4.(c)(1)(A)(V).

[30]     *Alcatel-Lucent USA Inc. v. Commonwealth*, 803 F.R. 2017, 2021 WL 4142426, at *8 (Pa. Cmwlth. Sept. 13, 2021) (unpublished).

retroactive application, since *Nextel* did not establish a new principle of law but instead relied upon established tax-uniformity precepts.

The panel nevertheless concluded that *Nextel* should not apply retroactively because the second and third *Chevron* factors militate in favor of prospective-only application. Specifically, the panel reasoned that applying *Nextel* retroactively "would not forward the operation of" of our Court's decision in *Nextel* given that Alcatel was "attempting to avoid application of the percentage cap altogether," whereas our decision in *Nextel* "upheld the percentage cap."[31] As for the third *Chevron* factor, the panel concluded that retroactive application of *Nextel* "would produce a substantially inequitable result" because "taxpayers that took the dollar-based NLC deduction would actually owe more taxes if now forced to take the lesser, percentage-based deduction."[32] Thus, in balancing the *Chevron* factors the panel held *Nextel* should not be applied retroactively.[33]

Alcatel filed exceptions to the panel's ruling. While those exceptions were pending, this Court decided *General Motors*, where we held that *Nextel* applies retroactively, and that the Commonwealth must refund corporations that were constrained by the unconstitutional cap.[34] In light of *General Motors*, an *en banc* panel of the Commonwealth Court sustained Alcatel's exceptions and reversed the three-judge panel's earlier holding.[35] Citing *General Motors*, the *en banc* court held that *Nextel* applies retroactively and that due process requires that the Commonwealth refund Alcatel in order to

---

[31] *Id.* at *5.

[32] *Id.*

[33] *Id.* at *6.

[34] *Gen. Motors*, 265 A.3d at 380.

[35] *Alcatel-Lucent USA Inc. v. Commonwealth*, 291 A.3d 438 (Pa. Commw. 2022) (*en banc*).

"equaliz[e] the tax positions between favored and nonfavored taxpayers."[36]  The Commonwealth then appealed, arguing that:  (1) the *en banc* court erred in applying *General Motors*; and (2)  *General Motors* should be overturned.

## IV.  Analysis

We agree with the Commonwealth that *General Motors* was incorrectly decided.  Although the *General Motors* majority purported to apply the three-factor *Chevron* test to determine whether *Nextel* should apply retroactively, the Court failed to analyze all three *Chevron* factors.  As explained above, courts applying *Chevron* must consider: (1) whether the decision in question established a new principle of law; (2) whether retroactive application of the decision would forward the operation of the decision; and (3) whether the relevant equities favor prospective application.[37]  The *General Motors* majority only addressed the first *Chevron* factor, concluded that *Nextel* did not announce a new principle of law, and then declined to address the second and third factors.[38]  This alone was error.  Although the United States Supreme Court in *Chevron* seemed to treat the first factor as a threshold question,[39] Pennsylvania case law makes clear that all three *Chevron* factors are relevant to the retroactivity inquiry.[40]  Indeed, this Court has stressed

---

[36]     *Id.* at 447.

[37]     *Oz Gas*, 938 A.2d at 282.

[38]     *Gen. Motors*, 265 A.3d at 373 n.17 ("As we find the first factor to control this analysis, we do not speak to the second and third *Chevron* factors.").

[39]     *Chevron Oil*, 404 U.S. at 106 ("First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed." (internal citations omitted)).

[40]     *See Blackwell v. Pa. State Ethics Comm'n*, 589 A.2d 1094, 1101 (Pa. 1991) (concluding that the decision at issue did not announce a new principle of law, but nevertheless weighing the equities); *Dana Holding Corp. v. W.C.A.B.*, 232 A.3d 629, 640 (Pa. 2020) ("[W]hile judicial decisions declaring statutes unconstitutional may not readily fit the paradigm of new rules or principles of law, particularly when the underlying (continued…)

that the third factor—which the *General Motors* Court never even reached—is often the most important one.[41]

As for the *General Motors* majority's conclusion that *Nextel* did not announce a new principle of law, we believe that this too was erroneous. The majority insisted that *Nextel* merely applied "a century of" pre-existing "case law interpreting the Uniformity Clause to invalidate tax 'classifications based solely upon the quantity or value of the property being taxed.'"[42] Yet all of the cases that the *General Motors* majority relied upon involved taxes distinguishable from the NLC deduction at issue in *Nextel*.

Unlike the cap on carried-over losses in *Nextel*, *Kelley v. Kalodner* involved a graduated-rate income tax that violated the Uniformity Clause because it "result[ed] in taxing those whose incomes arise above a stated figure merely" because the General Assembly believed that those incomes were "sufficiently great to be taxed."[43] The tax statute that we struck down in *Cope's Estate* also bears no resemblance to the NLC deduction. *Cope's Estate* involved an inheritance tax that exempted from taxation the first $5,000 worth of property in every estate, which had the effect of exempting 90-95% of all estates in Pennsylvania from paying any inheritance tax at all. In striking down this tax as non-uniform, we explained that our Constitution divests the General Assembly of authority to exempt certain taxpayers based on the "the amount in value of property to be

---

constitutional precepts are well established, . . . such decisions raise the same concerns about reliance and vested rights that have animated the application of balancing tests to determine whether the effect of new rules should be limited to prospective application.").

[41]  *Am. Trucking Ass'ns, Inc. v. McNulty*, 596 A.2d 784, 790 (Pa. 1991) ("[T]he factors of *Chevron Oil v. Huson* remain determinative, with greater importance being assigned to the third factor, weighing the equities.").

[42]  *Gen. Motors*, 265 A.3d at 368 (quoting *Nextel*, 171 A.3d at 696).

[43]  *Kelley*, 181 A. at 602.

taxed."[44]   That same rule was also applied in *Saulsbury v. Bethlehem Steel Company*, where we struck down a local ordinance that exempted those earning less than $600 in a given calendar year from the city's occupational tax.

While certain broad principles announced in *Kelley*, *Cope's Estate*, and *Saulsbury* do lend support for the idea that the statutory cap on NLC deductions renders the tax non-uniform, this Court's pre-*Nextel* case law had suggested that those individual income-tax decisions do not necessarily apply in the context of corporate income taxes.  In *Warner Brothers*, for example, we rejected a Uniformity Clause challenge to a flat-dollar cap on deductions from corporate income.[45]   Although this Court did not fully explain why the corporate deduction in *Warner Brothers* satisfied the Uniformity Clause while the individual exemptions in *Cope's Estate* and *Kelley* did not, we would go on to clarify many years later that analogies between individual income taxes and corporate income taxes are "unpersuasive" because corporations "are artificial legal entities created with the permission of the state for the purpose of maximizing profits for shareholders," whereas natural persons "cannot be likened to profit-maximizing entities."[46]   A dominant view therefore emerged from our case law that our Uniformity Clause jurisprudence gives "a more liberal interpretation to the substantial equality test" in cases involving corporate net income taxes.[47]

---

[44]   *In re Cope's Est.*, 43 A. at 81.

[45]   *Warner Bros.*, 27 A.2d at 64.

[46]   *Amidon*, 279 A.2d at 63.

[47]   Maria R. McGarry, *Taxation—New Interpretation of Pennsylvania's Requirement of Tax Uniformity—Leonard v. Thornburgh*, 59 TEMP. L.Q. 807, 814 (1986); *id.* at 817 ("Courts have given uniformity a broader interpretation in . . . corporate tax decisions than in individual income tax decisions.").

*Nextel* upset this expectation by applying the principle that "classifications based solely upon the quantity or value of the property being taxed" are unconstitutional even in the corporate net income tax context.  The Court also held for the first time that fixed caps on deductions fail the substantial uniformity test for the same reason that the exemptions in *Cope's Estate*, *Kelley*, and *Saulsbury* did.  This was a novel holding, and the *General Motors* Court erred in not recognizing so.  Indeed, our decision in *Nextel* conceded as much.  We admitted that we were dealing in that case with a tax that did "not explicitly exempt income below a certain threshold from taxation like the taxing statutes in [*Cope's Estate*, *Kelley*, and *Saulsbury*]" did.[48]

The *General Motors* Court attempted to explain away much of *Nextel*'s novelty by suggesting that the Uniformity Clause analysis in *Warner Brothers* was too scant to be taken seriously, and that our subsequent holding in *Amidon* distinguishing between corporate income taxes and individual taxes offered a "somewhat minimal analysis."[49] While those may be fair criticisms of the *Amidon* and *Warner Brothers* decisions, they are not entirely relevant to the question posed by *Chevron*'s first prong.  A judicial decision breaking with precedent can establish a new legal principle regardless of whether that precedent was well reasoned or poorly reasoned.  The question of retroactivity is quintessentially a question about reliance interests.  And lawmakers and taxpayers likely rely upon this Court's decisions even when they find the provided legal reasoning to be lacking.

Put simply, although the *General Motors* Court correctly recognized that *Nextel* was rooted in some of the broad pronouncements found in our Uniformity Clause jurisprudence, that does not mean that *Nextel* did not announce a new principle of law.

---

[48]     *Nextel*, 171 A.3d at 698.

[49]     *Gen. Motors*, 265 A.3d at 371.

Indeed, very "[f]ew decisions are so novel that there is no precedent to which they may be moored."[50] At its core, *Nextel* presented an issue of first impression. And our decision resolving that novel issue upset settled expectations by departing from *Warner Brothers* and *Amidon*. We therefore hold today that the *General Motors* Court erred in concluding that *Nextel* did not establish a new principle of law.

As for the second *Chevron* factor, we do not believe that retroactively applying the holding in *Nextel* to taxes that were levied prior to the decision is necessary to further the operation of the rule that we announced in *Nextel*. Indeed, even under a fully retroactive approach, refunds would still only be available to those taxpayers that are within the window for filing—or have already filed—refund petitions with the Department of Revenue. Thus, while there may be inequities associated with prospective-only application of *Nextel*, such inequities seem inevitable given that the General Assembly consistently has opted to use a capped NLC deduction since 1994.

The final *Chevron* factor requires that we balance the equities, which clearly weigh in favor of prospective-only application of *Nextel*. As we have explained in the past, retroactive application of a decision striking down a tax statute "subjects the taxing entities to the potentially devastating repercussion of having to refund taxes paid, budgeted and spent by the entities for the benefit of all, including those who challenged the tax."[51] For this reason, we have announced as a general rule that "a decision of this Court invalidating a tax statute takes effect as of the date of the decision and is not to be applied retroactively."[52] This general rule can be overcome, for example, upon a showing that

---

[50] *Harper v. Va. Dep't. of Tax'n*, 509 U.S. 86, 128 (1993) (O'Connor, J., dissenting).

[51] *Oz Gas*, 938 A.2d at 285.

[52] *Id.*

refunding the already-remitted taxes will not cause undue harm to the public fisc.[53]  But no such showing can be made here, where retroactive application of our decision in *Nextel* would require the Commonwealth to pay back millions of dollars in tax revenue that was collected and spent nearly a decade ago, in reliance on case law that this Court has since abandoned.  Thus, the third *Chevron* factor counsels against retroactivity.[54]

Because the factors outlined in *Chevron* all support prospective-only application of *Nextel*, the *General Motors* Court erred in holding that *Nextel* must be applied retroactively.[55]  Given this conclusion, we also disagree with the *General Motors* Court's separate holding that the Fourteenth Amendment's Due Process Clause requires that we

---

[53]     *See*, *e.g.*, *Sands Bethworks Gaming, LLC v. Pa. Dep't of Revenue*, 207 A.3d 315, 325 (Pa. 2019) (striking down a casino tax on uniformity grounds and ordering the Department of Revenue to refund the amounts collected, which were not yet spent and had been "held in abeyance . . . during the pendency of this matter").

[54]     Some of this Court's past decisions arguably have suggested that the *Chevron* test does not apply at all in tax refund matters.  In *Mount Airy*, for example, we applied the general rule that "a decision of this Court invalidating a tax statute takes effect as of the date of the decision," and we did not address the *Chevron* factors at all.  *Mount Airy*, 154 A.3d at 280 n.11; *see Gen. Motors*, 265 A.3d at 382 (Wecht, J., dissenting) (stating that "the *Oz Gas* rule has displaced the *Chevron* factors in the tax arena").  We clarify today that such statements are best understood as speaking directly to *Chevron*'s third prong.  In other words, the idea that a decision "invalidating a tax statute takes effect as of the date of the decision" merely recognizes that, absent special circumstances that tilt the equitable balance, the concerns analyzed under *Chevron*'s third factor will most often counsel against retroactivity in tax refund cases.

[55]     The dissent prefers the approach taken in *Harper*, a federal case whose relevance is undermined by the well-established rule that state law controls whether state courts must give their own decisions retroactive effect.  *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364 (1932) ("We think the Federal Constitution has no voice upon the subject.  A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward."); *see Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 177 (1990) (plurality) ("The determination whether a constitutional decision of this Court is retroactive—that is, whether the decision applies to conduct or events that occurred before the date of the decision—is a matter of federal law.  When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions.").

equalize the positions of the taxpayers that benefited from the cap on NLC deductions with those that were disadvantaged by it.[56] The *General Motors* Court posited that such a remedy was necessary given the United States Supreme Court's holding in *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*.[57] But *McKesson* only requires that we award backward-looking relief when our decision striking down the unconstitutional tax applies retroactively. Where, as here, we find that prospective-only application of a decision invalidating a tax statute is appropriate, any taxes collected prior to the date of our decision were not unconstitutional.[58]

The dissent does not defend the *General Motors* Court's application of the *Chevron* test. Instead, the dissent would hold, contrary to our precedent, "that challengers with claims pending on direct review are entitled to the benefit of a change in the law."[59] The dissent uses the specific circumstances of this case to argue for the wholesale abandonment of the general rule favoring nonretroactivity in tax matters. For example, the dissent asks rhetorically: "What incentive . . . does a challenger have to bring a constitutional challenge to a tax scheme when this Court refuses to provide that

---

[56]     *Gen. Motors*, 265 A.3d at 380 ("[T]he due process clause requires the Commonwealth to equalize GM's position with the favored taxpayers who were not subject to the $2 million NLC deduction cap by refunding the tax GM paid as a result of the imposition of the NLC deduction cap.").

[57]     496 U.S. 18 (1990).

[58]     *Auto. Trade Ass'n of Greater Phila. v. City of Philadelphia*, 596 A.2d 794, 796 (Pa. 1991) ("The result of the prospectivity decision was that the tax had not been unlawful when collected. There being no illegal collection to be remedied, the rule of *McKesson* did not apply.").

[59]     Dissenting Opinion at 13; *but see Oz Gas*, 938 A.2d at 285 ("[W]e reaffirm *McNulty* in holding that a decision of this Court invalidating a tax statute takes effect as of the date of the decision and is not to be applied retroactively."); *Mount Airy*, 154 A.3d at 280 n.11 (mentioning the same rule).

challenger with relief[?]"[60]  Yet the dissent itself acknowledges that this lack of an incentive cannot be attributed entirely to our retroactivity precedent; it is as much a consequence of the fact that the statute in question only applied to a single tax year.[61]  In a more typical case, "there is always an incentive, in the avoidance of liability for payment of taxes or fees in the future, to challenge the validity of a statute."[62]  It also warrants emphasizing that the lack of an incentive for taxpayers to challenge the constitutionality of tax statutes arises only in the context of *post-payment* constitutional challenges.[63]  In circumstances where a taxpayer is able to challenge the constitutionality of a tax *before paying it*, the incentive for doing so is quite obvious.

The dissent also suggests that applying *Nextel* retroactively but limiting its application only to taxpayers that have timely filed refund petitions with the Department for the tax year(s) in question would avoid "great strain to our Commonwealth's coffers."[64]  Contrary to the dissent's suggestion, the Commonwealth's total financial exposure here is substantial considering the number of refund petitions pending and the number of years in which the General Assembly has implemented a similarly structured NLC deduction. Although we do not know exactly what the total cost would be if *Nextel* applies retroactively and the Commonwealth is forced to issue refunds, the amount could easily

---

[60]     Dissenting Opinion at 11.

[61]     *Id.* ("[T]he 2014 NLC deduction was only applicable for the 2014 tax year.").

[62]     *Nextel*, 171 A.3d at 705 (quoting *Oz Gas*, 938 A.2d at 2845).

[63]     *Compare* 72 P.S. § 10003.1 (relating to refund petitions), *with* 72 P.S. § 9702 (relating to reassessment petitions); *see generally Sands Bethworks Gaming*, 207 A.3d at 318 (involving a complaint seeking declaratory and injunctive relief that was filed in this Court's original jurisdiction).

[64]     Dissenting Opinion at 12.

reach eight or nine figures.[65]  Furthermore, the dissent would abolish the *Oz Gas* rule favoring nonretroactivity not just for taxes imposed and collected at the state level.  The dissent's proposed rule would also apply to other taxing entities like local municipalities, which do not have multibillion-dollar budgets or the ability to refund taxes that were collected and spent long ago.  Thus, the mere fact that the treasury of this Commonwealth might be able to withstand retroactive application of *Nextel* does not justify discarding the general rule favoring nonretroactivity in tax cases.[66]

---

[65]  *See* Brief for Commonwealth at 23 (arguing that "[a]pplying *Nextel* retroactively in this instance would result in a tax refund exceeding $358 million."); *but see* Brief for Alcatel at 23 (questioning the accuracy of the Commonwealth's estimate but agreeing that "applying *Nextel* retroactively will require the Commonwealth to issue a significant amount of refunds to other taxpayers").  This rough estimate assumes that refunds will be limited to taxpayers that have timely filed refund petitions with the Department for the tax year(s) in question.  *See* $1,000,000,000 COMMONWEALTH OF PENNSYLVANIA GENERAL OBLIGATION BONDS, FIRST SERIES OF 2022 at 54, available at https://www.budget.pa.gov/Publications%20and%20Reports/InvestorInformation/Docum ents/PA%20OS%20Final%201st%202022.pdf ("Applying *Nextel* retroactively would result in tax refunds of approximately $150 million for the 2014–2016 tax years and tax refunds of approximately $208 million for the 2007–2013 tax years.").

[66]  The dissent notes, and we acknowledge, that the United States Supreme Court in *McKesson* left open the possibility that a state could remedy a discriminatory tax by collecting additional amounts from those favored by the scheme instead of issuing refunds to those disfavored by it.  But the *McKesson* Court itself admitted that efforts to do so "may not be perfectly successful."  *McKesson*, 496 U.S. at 41 n.23.  And the prospect of such a remedy in the present case is something of a chimera.  First, "there is a three-year statute of limitations under which the Department may order an additional assessment."  *Nextel*, 171 A.3d at 702.  Second, the Fourteenth Amendment's due process clause also limits the ability of the states to assess taxes retroactively. *McKesson*, 496 U.S. at 41 n.23 ("[B]eyond some temporal point the retroactive imposition of a significant tax burden may be 'so harsh and oppressive as to transgress the constitutional limitation,' depending on "the nature of the tax and the circumstances in which it is laid.") (quoting *Welch v. Henry*, 305 U.S. 134, 151 (1938) (suggesting that a tax on income received two years earlier approached but did not exceed "the limit of permissible retroactivity")).  Lastly, there are obvious practical difficulties associated with attempting to collect additional taxes a decade or two after they were paid.  *Id.* (noting that some entities "may no longer be in business" when the state attempts to collect additional taxes from them); s*ee generally General Motors*, 265 A.3d 353 (involving the 2001 tax year); *Nextel*, 171 A.3d 682 (involving a telecommunications company that no (continued…)

## V. Conclusion

Revisiting our holding in *General Motors*, we conclude today that the *Nextel* decision should be given prospective effect only and that due process therefore does not require the Commonwealth to refund the corporate net income taxes that Alcatel paid in 2014. Accordingly, we reverse the *en banc* decision of the Commonwealth Court.

Justices Dougherty, Mundy and McCaffery join the opinion.

Justice Mundy files a concurring opinion.

Justice McCaffery files a concurring opinion.

Chief Justice Todd files a concurring and dissenting opinion in which Justice Donohue joins.

Justice Brobson files a dissenting opinion.

---

longer exists because it was acquired by another telecommunications company that also no longer exists).